## MARVIN DRUG CO. v. COUCH.

No. 12763.

Court of Civil Appeals of Texas. Dallas.

Oct. 14, 1939.

Rehearing Denied Nov. 11, 1939.

Dissenting Opinion Nov. 25, 1939.

Supplemental Opinion Nov. 29, 1939.

Supplemental Dissenting Opinion Dec. 9, 1939.

Angelo Piranio, Lee T. Johnson, Jr., and O. F. Wencker, all of Dallas, for plaintiff in error.

Bowyer, Gray, Thomas & Jaffe, of Dallas, for defendant in error.

YOUNG, Justice.

Marvin Drug Company, plaintiff in error, was defendant in the trial court and A. B. Couch was plaintiff, and they will be so referred to here for greater clarity. Suit was for the alleged breach of an implied covenant relative to the operation of a drug store on Hillcrest Street, City of University Park, Dallas County, wherein plaintiff was lessor and defendant the lessee. Upon trial and answers of the jury to certain issues, plaintiff was given judgment for damages and attorney's fee in the sum of $2,033.77, which was by defendant duly appealed.

Mr. Couch was owner of the premises in question and had operated a drug business therein for a number of years. On December 12, 1933, he entered into a five-year written lease with defendant for the continued occupancy of the premises as a drug store, the rental consideration being "Five Per Cent (5%) of the gross cash received from sales, and money collected on accounts on business done from the leased premises during the first year of the lease term and Six Per Cent of the said gross cash received for the last four years of said term." Marvin Drug Company began occupying the leased premises on or about the above date and continued therein until November 6, 1937, when the lease was terminated by mutual agreement. It was plaintiff's contention, as evidenced by his pleading, that there was an implied covenant in the rental contract that defendant would operate the drug store in the usual and customary manner as drug stores were operated in the town and vicinity of University Park; alleging that from the inception of defendant's tenancy—December 12, 1933—up to January 16, 1937, it operated the premises in such usual and customary manner, the average rental received by plaintiff for the first year being $209 per month. During the second year of the lease, the average monthly rental was $332.48, and during the third year, $340.64 monthly; that beginning January 16, 1937, defendant ceased to operate the store in the usual and customary manner in which drug stores in that vicinity were operated, in that the store was not opened until eight o'clock in the morning and was closed at seven o'clock in the evening; further contending that for a period of time, curb service was not furnished to customers, the stock of merchandise was depleted, and that from January, 1937, up to the cancellation of the lease on November 6, 1937, plaintiff's average monthly rental was $110. Plaintiff further charged that, if the defendant had continued to properly operate the store, he would have received an average monthly rental of $375 per month for the year 1937; and recovery was sought for the difference between the rent actually received and that which plaintiff claims should have been forthcoming had the store been properly operated. Attorney's fee of $250 additional was claimed under the contract provision that "If, on account of breach or default by lessee of any of lessee's obligations hereunder, it shall become necessary for the lessor to employ an attorney to enforce or defend any of lessor's rights or remedies hereunder, then in any such event any reasonable amount incurred by lessor as attorney's fees shall be paid by lessee."

Defenses interposed by lessee, Marvin Drug Company, were, in substance, (1) of no implied covenant in the lease such as was alleged by plaintiff; no knowledge of a custom whereby drug stores in neighborhood districts or in the vicinity of the premises in question were to be opened or closed at any special hour; and that defendant was not obligated under the lease to operate the store in any particular manner; and (2) that during the entire period up to January, 1937, on account of conditions and of the percentage provided for in the lease as rent, defendant could not operate the business at a profit and that it closed the store in the evening and opened it later in the morning to minimize its losses; "That this defendant operated the store from January 1937 until the lease was surrendered in a proper manner, with due regard for proper business conditions, and that although the rental paid to plaintiff was not as large as had been paid in previous years, nevertheless by reason of closing earlier at night and opening later in the morning the defendant's losses were reduced and diminished." Defendant also denied that under any construction of the contract could it be liable for attorney's fees.

The issues submitted to the jury and their answers were:

"No. 1. Do you find from a preponderance of the evidence that during the year 1937 the Marvin Drug Company failed to operate the drug store on Hillcrest and McFarland in the usual and customary manner in which drug stores in such a vicinity are operated? Answer "Yes" or "no". Answer: Yes.

"No. 2. Do you find from a preponderance of the evidence that during the year 1937 the Marvin Drug Company failed to operate the drug store on Hillcrest and McFarland in a manner that would be reasonably expected of a person of ordinary prudence, having regard to the interest of the lessor A. B. Couch, and the lessee, Marvin Drug Company? Answer "yes" or "no". Answer: Yes.

"No. 3. What amount of money, if any, do you find from a preponderance of the evidence would reasonably have been received by A. B. Couch during the year 1937, up to the closing of the drug store in question under the lease from the operation of the drug store in question in a manner usual and customary for the operation of drug stores in such a vicinity? Answer in dollars, if any, and cents, if any. Answer 3,300.00 Three Thousand Three Hundred & No/100 Dollars.

"No. 4. What amount of money, if any, do you find from a preponderance of the evidence is a reasonable attorney's fee incurred by A. B. Couch for services rendered by his attorney in connection with this suit? Answer in dollars, if any, and cents, if any. Answer $250.00 Two Hundred Fifty & no/100 Dollars."

The amount of $1,516.23 actually received by plaintiff as rent during 1937 being deducted from the above jury finding of $3,300, plus the $250 attorney's fee, fixed the judgment of the trial court against defendant in the sum of $2,033.77 as heretofore stated.

Many of defendant's 22 propositions under its assignments of error relate to the same matters of law. In effect, the general questions presented in the briefs for our consideration are (1) whether plaintiff was entitled to maintain the suit on the theory of an implied covenant in the lease; (2) whether there was error in continuing the proceedings with eleven jurors after a finding by the court that one juror had become disabled during the course of the trial; (3) consisting of detailed objections to the submission of jury issues; (4) alleged improper argument of defendant's counsel to the jury.

Paragraph 9 of the lease provided that the stipulated percentage rental should be paid to lessor on the 10th of each month for the preceding month upon the basis of cash register readings of gross cash receipts, and should the lessor at any time be not satisfied with such readings, that he, at his own expense, could audit and check the drug store's books and reports. Plaintiff Couch testified that he had been operating the premises prior to the lease and occupancy by defendant, and that the time of opening was between six-thirty and seven o'clock in the morning, closing at twelve o'clock midnight; that defendant had employed plaintiff as manager of the store for six or seven months under the lease in question and the store continued to be opened and closed at approximately the same hours; that he was then transferred to defendant's Santa Fe Drug Store (down town) where he remained about eighteen months, when his resignation was requested; that after leaving defendant's employ, he observed the daily operation of the Hillcrest store and that same had been opened and closed about the same time as when he was manager thereof, i. e., from between six-thirty and seven A. M. and twelve o'clock midnight; that up to January, 1937, the stock was kept up, with good delivery and curb service, when a sign was put on the front door "We open at eight o'clock and close at seven"; that other changes occurred in a seeming indifference to business and customers, suspension of curb service and reduction of stock. Plaintiff further testified as to rentals and amount of gross cash received from business done at the store during 1936 and 1937, up to the time the lease was canceled. These comparative figures are:

| Month | 1936 | 1937 | Reduction in Volume |
|---|---|---|---|
| January | $6827 | $5221 | $1600 |
| February | 5254 | 4168 | 1086 |
| March | 4890 | 3029 | 1861 |
| April | 5557 | 2632 | 2925 |
| May | 5197 | 2630 | 2567 |
| June | 5788 | 2352 | 3436 |
| July | 5447 | 2028 | 3419 |
| August | 5184 | 2045 | 3139 |
| September | 4905 | 1734 | 3171 |
| October | 4827 | 1965 | 2862 |
| November | 5265 | 2515 | 2750 |

It was the testimony in part of Alfred Beilharz, a realtor and witness for plaintiff, that he had originally negotiated the lease between defendant and plaintiff, taking the deal up first with Z. E. Marvin, Jr., the preliminaries covering a period of two and a half or three months; that he had received a letter from defendant, dated November 24, 1933, the portion admitted in evidence being: "Lessee, under no conditions, will guarantee a minimum rent during the term of this lease. Lessor will be furnished a monthly statement of cash register readings of gross receipts by lessee. If and when, at any time, lessor is not satisfied with readings he may, at his own expense, audit or check our books or reports. * * * I think I have told you before our stores are operated and owned by ourselves and our employees, some of whom have been in our employ for over twenty-five years, which stands to reason that to have been associated with us this length of time honesty stands above all other things, also our record of filling over two millions of prescriptions during the past thirty years places us as to the leading druggist in Dallas. The name Marvin's has always and will always stand for a Real Drug Store. We feel in asking the above that we are entitled to a lease of this nature. I am sure, beyond all doubt, that by putting our name at this corner we will have an excellent business, the fact that we will have to stock this store almost completely, which will take in the neighborhood of $7,000.00 to $8,000.00 of merchandise besides hundreds of dollars of publicity, will also have to be taken into consideration. Also a large part of the Highland Park business from Marvin's will be relayed to and delivered from this store."

Mr. Beilharz further stated that several months after the lease was executed, he moved into an upper floor of the building in which the store was located and there maintained an office; that defendant, in the beginning, opened the store around six-thirty A. M., closing around twelve at night until January, 1937, when it started opening about eight o'clock in the morning and closing at seven P. M.; and that he had received the following written notice from defendant:

"January 16, 1937

"To Our Hillcrest Store Customers:

"A check up on our night sales at our Hillcrest store demonstrates the advisability of our closing this store evenings. Beginning today, therefore, our Hillcrest store will close daily at 7:00 o'clock P. M. I hope you will indulge us in this economy and continue to give us your business. Our other stores remain open evenings 'till 12:00 midnight, with the exception of our store in the Santa Fe Building, which store closes at 8:00 o'clock P. M. Appreciating your business and assuring you of our continued effort to merit your support, I am

"Very sincerely,

"Marvin Drug Company

"ZEMSR:K" By: Z. E. Marvin, Sr.

This witness also stated that most suburban drug stores over Dallas opened anywhere from six to seven in the morning, closing around eleven to twelve at night; that the community of University Park had about doubled in population since 1933, but at the time of trial (May, 1938) there had been no increase in the number of drug stores within the corporate limits of said town. Other witnesses for plaintiff testified that similar stores in the vicinity opened around seven A. M. and closed around twelve o'clock at night, and that it was not customary for suburban drug stores to close at seven in the evening.

The writing under consideration carried the usual and customary covenants and matters incident to a five-year contract of lease, except as to payment of rents. As argued by defendant, the instrument is not ambiguous, containing a number of express covenants; for example, with reference to the rents and payment thereof, and plaintiff's right of accounting at his own expense, but nothing explicit is stated regarding the manner of operation by defendant during the term. The implied covenant declared upon is that the lessee "would operate the drug store in the premises in the usual and customary manner in which drug stores in that vicinity were operated." Defendant first contends that said implied obligation is inconsistent with the express provision for rent on a percentage basis, and that plaintiff's trial pleading as to custom was insufficient in specific particulars. Undoubtedly defendant was under some sort of legal duty with respect to operation. Lessee recognized this in its defensive allegations that it performed its lease obligation "with due regard for proper business operations". In ascertaining what the parties to the contract intended as a legal yardstick or stand-

ard of operation, we may look to the circumstances surrounding the inception of the lease, the situation of the parties and the subject matter involved, without regard to whether the terms of the instrument are ambiguous; Ryan v. Kent, Tex.Com. App., 36 S.W.2d 1007. Bearing in mind that the lease in suit is silent as to the measure of the "proper" manner in which defendant obligated itself to operate thereunder, it is apparent that an implied covenant existed as to operation; for certainly plaintiff's rental depended upon the amount of business done upon the premises. The law underlying implied covenants must therefore be considered in fixing defendant's duty in this respect. Quite applicable also are the principles announced in numerous cases concerning mineral or land leases where the land owner's rental or royalty is dependent upon the output of the property, following occupancy and development. The rule, we think, appropriate to the instant case, is stated in Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 1041, 60 A.L. R. 890: "The court cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties in the contracts made. Before a covenant will be implied in the express terms of a contract, and in some cases in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties as that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to imply such covenant in order to give effect to and effectuate the purpose of the contract as a whole."

See also 13 C.J. p. 558; 15 C.J. p. 1214; 12 Amer.Jur. (Contracts), Sec. 239, pp. 765–769. Defendant's legal duty incident to the implied covenant here involved is set forth in analogous cases found in annotations to Freeport Sulphur Co. v. American Sulphur Royalty Co., supra; 60 A.L.R., pages 903, 904; and the Austin Court, in Cammack v. Rogers, 32 Tex.Civ.App. 125, 74 S.W. 945, 948, upon construing an agricultural lease long ago, observed that: "* * * in a contract for rent, where the landlord is to receive a part of the crop, there is an implied covenant that ordinary care should be exercised by the tenant to cultivate the premises in a farmerlike manner."

Therefore, considering the situation of the parties at the inception of the lease, plaintiff's previous schedule of operation as to hours, the continuance thereof by defendant during the greater part of the term, we conclude it naturally to have been within the contemplation of the parties that the store should be operated as was usual and customary of similar stores in the vicinity; and, as already pointed out, the instrument being silent on the subject, defendant's obligation in this regard will be implied. In fact, defendant's own practical interpretation of the contract through usual and customary operation up to January, 1937, clearly raises the issue as to the measure of its legal duty to operate, just discussed, and as embodied in the court's charge.

Issue No. 2, inquiring if defendant had failed to operate the premises in a manner that would be reasonably expected of a person of ordinary prudence, having regard to the interest of lessor and lessee, was undoubtedly proper; the fact question following closely the correct rule announced by Judge Van Devanter (then Circuit Judge), in Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, quoted with approval by Judge Pierson in Freeport Sulphur Co. v. American Sulphur Royalty Co., supra, that "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

But defendant contends that it rightfully operated as it did from January, 1937, to December, when the lease was canceled, in order to minimize the losses which defendant had experienced almost from the beginning. The contract contained no provisions permitting lessee to abridge its operations or its legal duty to lessor in event of losses; and performance cannot be excused by the fact that the contract was profitless and expensive; 10 Tex. Jur. (Contracts), Sec. 249; 12 Amer.Jur., Sec. 362, pp. 928–930. The principles and cases relied upon by defendant in support of such contention, from 11 Tex.Law Review, p. 439, are obviously not in point, being altogether with reference to oil and gas leases where the lessee's obligation is limited or discharged by failure of production "in paying quantities".

Defendant next complains of alleged error in discharging a juror on the second day of the trial over its objection; and of continuing the proceedings to a verdict with a jury of eleven men, on the ground that the excused member of the panel was not disabled within the purview of the Constitution and statute. The language of our State Constitution, Art. 5, Sec. 13, Vernon's Ann.St., is similar in tenor to Art. 2204, R.S., which provides that "Pending a trial of a civil case in the district court, where one or more jurors may die or be disabled from sitting, if there be as many as nine of the jurors remaining, those remaining may render and return a verdict; * * *". The peculiar acts and conduct of the juror, indicating mental disability, were not brought to the attention of the court until after his voir dire examination and selection as one of the twelve. While no hearing was had touching the juror's mental condition, after he was sworn in, yet the court made specific findings of fact based upon observation and knowledge, when qualifying defendant's bill of exceptions, concluding therefrom that the juror was "mentally of unsound mind and is disabled from serving on the jury and is therefore excused." The matter of determining whether a juryman in a district court is disabled from further sitting, under the above provisions of the Constitution and statute, is held to be within the sound discretion of the trial court. 41 Tex.Jur. (Trial Civ. Cases), Sec. 110, p. 865. It is immaterial that the juror appeared fully qualified at the time of his acceptance upon the panel. The law is expressly designed to cover any disability discovered or becoming evident "pending the trial". The court's action, based upon the findings in the bill, were plainly within the principles of Houston & T. C. Railway Co. v. Waller, 56 Tex. 331; the facts disclosing a present mental disablement on the part of the juror, rather than a mere distress of mind. See also Sunset Wood Co. v. Broadnax, Tex.Civ.App., 136 S.W. 487, writ refused.

Defendant's assignments of alleged improper argument of plaintiff's counsel to the jury are considered to be without merit. Mr. Bowyer, in reading a letter, a portion of which was in evidence, inadvertently read a sentence which had not been admitted. The error being immediately discovered, counsel asked that it be withdrawn. Defendant made no objection at the time and did not request the court to instruct the jury concerning the item. The parts of the letter admitted contained statements similar in substance; thus it cannot be said that such incident was in anywise harmful or prejudicial. By bill of exception No. 4, complaint is made of other statements in argument by counsel for plaintiff, as being wholly without foundation in the record. We think the matters claimed to be erroneous are but inferences that could be properly drawn from portions of admitted testimony. As said by Judge Stokes, in Massie v. City of Floydada (Amarillo), Tex.Civ.App., 112 S.W.2d 243, 247, "* * * a rather wide range is always allowed counsel in their arguments before juries so long as they confine themselves to deductions, discussions, explanations, or interpretations of the testimony and the charge of the court". Similarly, we conclude that no error is shown by the contents of bill of exception No. 5, the argument consisting of inferences and deductions that could fairly be drawn from the record. Moreover, it appeared that upon objection by defendant, the jury was instructed to disregard the particular remarks. The argument, even if deemed improper, was not of such prejudicial nature as that it could not have been cured by the given instruction.

All other assignments and propositions not above singly discussed have been fully considered and are overruled. As a consequence, it is our judgment that this cause should be affirmed.

Affirmed.

BOND, Chief Justice (dissenting).

The penalty of $2,033.77 damages and $250 attorney's fee, visited upon plaintiff in error, Marvin Drug Company, for an alleged breach of a written contract, has no basis either in pleading or proof. The amount is grounded on losses calculated on far-fetched anticipation of sales in a retail drug store, which necessarily depended upon the number of customers, over whom plaintiff in error had no control, and the amount of their purchases for the period—necessarily pure conjecture.

Defendant in error was plaintiff in the court below and plaintiff in error was defendant; they will be so designated here.

In 1933, plaintiff, A. B. Couch, owner of one of two drug stores on Hillcrest Avenue, in the vicinity of Southern Methodist University, entered into negotiations with Z. E. Marvin, Sr., President of

Marvin Drug Company, a corporation, for a lease of the building in which he was then conducting a retail drug store, resulting, finally, in the execution of a written contract, the alleged breach of which is involved in this suit. The contract is quite lengthy, expressing many conditions and covenants not material here, except to show the exactness of the contracting parties in making the agreement depicting their contractual relationship. The contract, as I interpret it, leaves nothing for implication, except, perhaps, an obligation that the lessee will fairly exercise its own known business methods and principles in conducting a drug store in the leased premises.

At the expense of being prolix in this dissent, it is deemed advisable to quote the contract in full, as follows:

"This Agreement of Lease, Made this 12th day of December, A. D. 1933, by and between A. B. Couch, known herein as Lessor, and Marvin Drug Company, a corporation, known herein as Lessee, (The terms "Lessor" and "Lessee" shall be construed in the singular or plural number according as they respectively represent one or more than one person.) Witnesseth, That the said Lessor does by these presents Lease and Demise unto the said Lessee the following described property, to-wit: Lying and being situated in the City and County of Dallas, State of Texas, and being premises known as 6401 Hillcrest Street in the City of University Park, Texas, and fronting approximately twenty-five (25) feet on Hillcrest Street and extending back approximately seventy-five (75) feet along McFarlin Blvd. and being the corner store space heretofore occupied by the University Pharmacy, together with furniture and fixtures described in exhibit "A" which is attached hereto and made a part thereof, for the term of five years, beginning the 12th day of December, 1938, to be occupied as a drug store and not otherwise, paying therefor the sum of Five Per Cent of the gross cash received from sales and money collected on accounts on business done from the leased premises during the first year of the lease term and six per cent of the said gross cash received for the last four years of the said term, as hereinafter set forth, upon the conditions and covenants following:

"1. That the Lessee shall take good care of the property and its fixtures, and suffer no waste; keep the plumbing work, closets, pipes, and fixtures belonging thereto in repair; and keep the water pipes and connections free from ice and other obstructions, to the satisfaction of the municipal and police authorities, during the term of this lease, and at the end or other expiration of the term shall deliver up the demised premises in good order and condition, natural deterioration and damage by fire and the elements only excepted, all alterations, additions, and improvements, except trade fixtures, put in at the expense of Lessee shall be the property of the Lessor and shall remain upon and be surrendered with the premises as a part thereof at the termination of this lease.

"That the Lessee shall pay the water tax imposed on the hereby leased premises as the same shall become due during the term of this lease.

"2. That the Lessee shall promptly execute and fulfill all the ordinances of the city corporation applicable to said premises and all orders and requirements imposed by the Board of Health, Sanitary and Police Departments, for the correction, prevention and abatement of nuisances in or upon or connected with said premises during the said term, at Lessee's expense.

"3. That the Lessee shall not assign this agreement or underlet the premises, or any part thereof, (except as may be mentioned herein) or make any alteration in the building (except as may be mentioned herein), without the consent of the Lessor in writing; or occupy or permit or suffer the same to be occupied for any business or purpose deemed extra hazardous on account of fire.

"4. In case of damage by fire or tornado, the Lessee shall give immediate notice to Lessor, who shall thereupon cause the damage to be repaired forthwith and allow the Lessee a fair abatement or diminution of rental in proportion to the extent to which the premises are untenantable; but if the leased premises or the buildings of which the leased premises are a part, shall by the Lessor or Lessee be deemed so damaged as to be unfit for occupancy, or if the Lessor shall decide to rebuild, the lease shall cease and the rent be paid to the time of the fire or tornado.

"5. That in case of default in any of the covenants herein Lessor may enforce the performance of this lease in any modes provided by law, and this lease may be forfeited at Lessor's discretion if such default continue for a period of ten days after Lessor notifies said Lessee of such default

and his intention to declare the lease forfeited, such notice to be sent by the Lessor by mail or otherwise to the demised premises; and thereupon (unless Lessee shall have completely removed or cured said default) this lease shall cease and come to an end as if that were the day originally fixed herein for the expiration of the term hereof, and Lessor's agent or attorney shall have the right, without further notice or demand, to re-enter and remove all persons and Lessee's property therefrom without being deemed guilty of any manner of trespass. If, on account of breach or default by Lessee of any of Lessee's obligations hereunder, it shall become necessary for the Lessor to employ an attorney to enforce or defend any of Lessor's rights or remedies hereunder, then, in any such event, any reasonable amount incurred by Lessor as attorney's fee shall be paid by Lessee.

"6. In the event that the Lessee shall become bankrupt or shall make a voluntary assignment for the benefit of creditors, or in the event that a receiver of the Lessee shall be appointed, then, at the option of the Lessor and upon five (5) days' notice to the Lessee of the exercise of such option, this lease shall cease and come to an end.

"7. Lessor agreed to pay to the Realtor negotiating this lease the customary leasing fee in accordance with the commission schedule of the Dallas Real Estate Board, and the usual fee on any renewal of this lease.

"8. As part of the consideration hereof, it is agreed between the parties that the Lessee shall be and is hereby granted an option to renew this lease contract for an additional five years for a rental of six per cent of the said gross cash received.

"9. It is further agreed between the parties as a part of the consideration hereof that the rental shall be paid by the Lessee to the Lessor monthly on the 10th day of each calendar month for the preceding month; and that the Lessee shall furnish to the Lessor a monthly statement of cash register readings of gross cash receipts by Lessee; and that should the Lessor at any time be not satisfied with the said readings, he may at his own expense audit and check Lessee's books and reports.

"10. It is further understood and agreed that A. B. Couch warrants and represents the building to be in first class condition and in a good state of repair and the said Lessor hereby covenants and warrants to maintain the same at his expense in good state of repair and good condition during the term of this lease; and that there shall be no liabilities on the Lessee for the upkeep and repair the need for which is caused by Lessee's negligence; Lessor agrees to replace any broken plate-glass windows; Lessor agrees to paint said store both inside and outside at the beginning of this lease and thereafter as needed.

"In Testimony Whereof, The parties to this agreement have hereunto set their hands in duplicate, the day and year above written."

It is observed that there is not a single expression in the contract which could possibly give rise to an implied agreement that Marvin Drug Company was to conduct and operate a drug store in the leased premises "in the usual and customary manner in which neighborhood drug stores are operated in the City of Dallas"; that is, open at 7 o'clock, a. m. and close at 12 o'clock in the evenings. Plaintiff's petition shows that the contract lacks such express agreement, nevertheless it is alleged that, "there was an implied agreement and covenant that defendant would operate the drug store in the premises in the usual and customary manner in which drug stores in that vicinity were operated". The verdict of the jury and judgment of the trial court, affirmed herein by the majority opinion, were based upon the assumption that there was such an implied agreement. Query: On what theory of law can it be said that the written contract implies an oral agreement as to when the drug store shall open and close? The contract is nowise alleged to be ambiguous; plaintiff does not seek to change or alter its terms, or to add conditions or covenants inadvertently left out through accident or mistake; and there are no allegations that defendant knew of any such custom in the conduct of drug stores in the vicinity of the University.

In the case of Pierson v. Canfield, Tex. Civ.App., 272 S.W. 231, 233, Justice Looney, speaking for this Court, said: "* * * the instrument, or instruments, exchanged and forming a part of the transaction constitute the final and exclusive evidence of the intent of the parties and of the covenants entered into."

The implied covenant, which has been ingrafted upon the written contract between the parties in the case at bar, i. e., to conduct and operate the drug store "in

the usual and customary manner in which drug stores in that vicinity are conducted", is tantamount to the court's making a contract for the parties. No implied covenant can be read into an unambiguous written contract, which contains express covenants of its terms effectuating the intention of the parties. Plaintiff's petition does not allege that the custom relied upon was a general custom, or one of which all parties to the lease had notice. Mere allegations that the leased premises were not used as a drug store "in the usual and customary manner in which neighborhood drug stores in that vicinity are operated, in that the store would be opened not later than seven o'clock A. M. in the morning and closed not earlier than twelve o'clock in the evening"; and, further, "that it is usual and customary for neighborhood drug stores to be opened at a comparatively early hour in the morning and to remain open until late at night", and, still further, that "by reason of defendant's breach of the implied covenant and agreement in the lease to operate the drug store in the customary manner in which drug stores are operated in the City of Dallas and University Park", go far afield in stating a cause of action against the lessee for failure to open and close the drug store to conform to an alleged custom, in the face of an unambiguous, express written contract. Indeed, implication arises in all such contracts that the lessee will not suspend operation, but the manner of its operation, the hour of its opening and closing, are matters wholly within the judgment and sound business discretion of the operating party, provided he acts in good faith. The record shows, uncontradicted, that to keep the drug store open for eighteen hours each day, from seven a. m. to twelve p. m., was unsound business practice, resulting in loss. The rule is announced in Brewster v. Lanyon Zinc Co., 8 Cir., 140 F. 801, quoted with approval by our Supreme Court in Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 1044, 60 A.L.R. 890, wherein the court said: "Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

So, in the case at bar, can it be said that it was within the contemplation of the parties that the lessee would open the drug store at seven o'clock a. m. and close at twelve o'clock p. m., when the sales during the early and late hours would not, in the exercise of sound business discretion, justify such operation. Courts cannot make contracts for parties, and can declare implied covenants to exist only when there is a satisfactory basis in the express contracts of the parties which makes it necessary to imply certain duties and obligations to effect the purposes of the parties in the contracts made. Our Supreme Court, in Freeport Sulphur Co. v. American, supra, said: "Before a covenant will be implied in the express terms of a contract, and in some cases in view of the customs and practices of the business to which the contract relates, it must appear therefrom that it was so clearly in the contemplation of the parties as that they deemed it unnecessary to express it, and therefore omitted to do so, or that it is necessary to imply such covenant in order to give effect to and effectuate the purpose of the contract as a whole". Thus, the custom and practice of other operators of drug stores, of opening at an early morning hour and closing at midnight, cannot be said to be within the contemplation of the parties, as that they deemed it unnecessary to express it, or that it is necessary to imply such covenant in order to give effect to and effectuate the purpose of the contract as a whole. The only implication that could reasonably be expected by the contracting parties, is that, the lessee will conduct in good faith a drug store to the mutual interest of both the lessor and lessee, exercising the well-known business ability of the operators of Marvin Drug Company. The alleged custom or usage relied upon obviously finds no support in the contract. The length of time such custom or usage had prevailed in the vicinity is not shown, nor that the defendant had notice of such usage and custom, which are necessary elements in pleading custom and usage. 17 C.J. p. 450, Sec. 9, 10; i. d. p. 454, Sec. 15; Taylor v. Mueller, 30 Minn. 343, 15 N.W. 413, 44 Am.Rep. 199; Schumacher v. Trent, 18 Tex.Civ. App. 17, 44 S.W. 460. In the absence of pleadings that the lessee actually knew of such custom and usage, or the antiquity thereof in the vicinity, justifying an inference that the lessee knew of it, or that the parties to the lease had such action in view in making the contract, there are no legal grounds for the judgment rendered in this case.

It is further observed that the contract expressly provides: "(5) That in case of default in any of the covenants herein, les-

sor may enforce the performance of this lease in any modes provided by law, and this lease may be forfeited at lessor's discretion, if such default continue for a period of ten days after lessor notifies said lessee of such default and his intention to declare the lease forfeited, * * *. If, on account of breach or default by lessee of any of lessor's obligations hereunder, it shall become necessary for the lessor to employ an attorney to enforce or defend any of lessor's rights or remedies hereunder, then, in any such event, any reasonable amount incurred by lessor as attorney's fee shall be paid by lessee." These provisions, obviously allow the lessor a remedy for any default in any of the covenants expressed therein, and on account thereof, obligate the lessee to pay the attorney's fee. It is not contended, in pleadings or proof, that the lessee defaulted in any covenant expressed in the contract or that the lessor employed an attorney to enforce rights or remedies thereunder. The lessor, having an express remedy for breach of any covenants in the contract, to the exclusion of all others, is limited to the remedy expressed. Where contracting parties have an express remedy, no implied covenant effecting the breach can be the basis of a suit. Furthermore, can it be said that it was the contemplation of the lessor and lessee to pay attorney fees for anything other than a breach of the express covenants? The terms of the contract, in my judgment, answer the question in the negative.

For the reasons above stated, the cause should have been reversed and here rendered for the defendant; at most, the cause should be reversed and remanded, for reasons herein mentioned.

This cause was submitted to a jury of twelve men. During the course of the trial, over the objections of the defendant, the trial judge dismissed one of the sworn jurors for reasons satisfactory only to himself, and too, according to the defendant, with the right to withdraw its announcement of ready. The Constitution of Texas, Art. 5, Sec. 13, Vernon's Ann.St., provides: "When, pending the trial of any case, one or more jurors not exceeding three, may die, or be disabled from sitting, the remainder of the jury shall have the power to render the verdict." Article 2204, Revised Statutes of Texas, 1925, provides: "Pending a trial of a civil case in the district court, where one or more jurors may die or be disabled from sitting, if there be as many as nine of the jurors remaining, those remaining may render and return a verdict; but in such case the verdict must be signed by each juror rendering it." In the case of Houston & T. C. R. Co. v. Waller, 56 Tex. 331, our Supreme Court had this to say, pertinent here, on the above constitutional provisions:

"It appears by bill of exceptions in this case, that pending the trial, and 'after the depositions of several witnesses had been read, a communication in writing was handed to the judge presiding which purported to be from the wife of the juror Thomas H. Bradbury to the said Bradbury, informing him that one of their children was sick, and requesting him to come home if he could. The judge presiding being of the opinion that this information disabled the said juror from sitting, and thereupon peremptorily discharged him, said Bradbury, from the jury, and ordered the trial to proceed with the remaining eleven, over the objection of the defendant's attorneys.' This bill of exceptions is approved with the following explanation: 'The court asked the juror if the intelligence in the written communication of his wife satisfied him that it was necessary for him to be at home to attend his sick child. The juror answered it did, and manifested in his answer such distress as such intelligence would naturally create in a parent. And the court was satisfied, in his present state of mind, that said juror was disabled thereby from further acting as a juror.'

"Our opinion is that a juror is not 'disabled from sitting' within the meaning of the constitution by mere distress of mind. Such distress, caused by information of sickness in his family, calling for his presence at home, might be a sufficient cause for suspending the progress of the trial, if in the judgment of the court the emergency required such a course. But this is not the character of disability which the constitution classes side by side with death. If a juror becomes so sick as to be unable to sit longer, he is plainly disabled from sitting. Ray v. State, 4 Tex.App. [450] 454. If by reason of some casualty or otherwise he is physically prostrated, so as to be wholly incapable of sitting as a juror, or loses his mental powers, so as to become insane or idiotic, then too he would be disabled from acting as a juror. But, without deeming it proper to attempt to define fully the meaning of the expression

used in the constitution, we are satisfied that the causes which disable the juror from sitting, and justify the extreme course of allowing, over a party's objection, a verdict to be rendered by the remainder of the jury, must be of a nature more directly showing his physical or mental incapacity than mere mental distress occasioned by the sickness of others, and the feeling that duty to the sick demanded his presence elsewhere. Extreme cases of the kind, however strongly they may appear to the court to release the juror, do not belong to the class provided for by the constitution or statute.

"We think that it appears from the bill of exceptions that the court, over the objections of the defendant, ordered the trial to proceed with eleven jurors, and that this error of the court is fatal to the judgment."

So, in the case at bar, the trial court peremptorily discharged a juror, without questioning him as to his fitness, and without the defendant having an opportunity to question him on his disqualification. After the trial, in a qualified bill of exception, the trial judge for the first time assigned his reasons for discharging the juror, and requiring the defendant to proceed with the trial before the eleven. The conclusion of the majority that such action was proper, not presenting a reversible error, is a dangerous precedent for courts. I am not in accord with the holding. Litigants have a legal right to question jurors on their qualifications and fitness for jury service; it does not lie within the powers of a trial judge to peremptorily discharge a juror over the objection of the litigants, because, forsooth, the action of the juror indicates to the mind of the judge, that such juror was not qualified to sit in the case.

For the reasons above indicated, I am of the opinion the judgment should be reversed and here rendered for the defendant; accordingly, I register my dissent.

Supplemented Opinion.

YOUNG, Justice.

The above dissent of Chief Justice BOND seems to indicate that appellant was not allowed a bill of exceptions relative to excusing the juror until after the trial, when the court, for the first time, assigned its reasons therefor. In such connection, we deem it proper to quote the statement of Judge Hughes in signing the particular bill, as the facts there stated are all that the record shows regarding the incident:

"In approving the above bill of exception which was taken at the time of the occurrence and was then and there qualified by me in the following language, I now adopt as a qualification to this bill the following, to-wit:

"'After the juror was chosen, he had to be shown his place in the jury box. During the two recesses and the first afternoon he picked up a hat in one of the chairs and looked at it. When court adjourned that afternoon he said that he was looking for his hat and had lost it. The bailiff took him into the jury room and not finding the hat, took him down to the Central Jury Room where he had left his hat.

"'The following morning he stated to the bailiff that he had not been feeling well the day before, but that he had worked most of the day and had then gone home, and that he had decided to come back and work part of the day.

"'At the noon recess he again stated he had lost his hat and tried to pick up the bailiff's hat and walk off with it. His hat was finally found by the bailiff in the jury room. On return from the noon recess, the bailiff met him in the hall downstairs and he stated that he could not find those men he had been working with all morning.

"'When court convened at 2:00 o'clock he was not in the jury box and could not be found by the bailiff, who went in all of the courts and also walked up the street as far as Sanger Bros. The court is of the opinion that he is mentally of unsound mind and is disabled from serving on the jury and is therefore excused.'"

It would appear then that the said juror was not available for the usual method of procedure under article 2204, i. e. a hearing touching disability; and, as already found in the majority opinion, the above conclusion was based on facts occurring either in the presence of the court or of which it could take judicial cognizance.

Supplemental Dissenting Opinion.

BOND, Chief Justice.

After the filing of the dissenting opinion in this case, the majority deemed it advisable to relate the reasons assigned by the trial court in discharging the juror in question, by quoting verbatim the append-

ed qualification to appellant's bill of exception, made long after trial, concluding with the statement: "The court is of the opinion that he (the juror) is mentally of unsound mind and is disabled from serving on the jury and is therefore excused". It is evident; the conclusion reached by the learned trial judge, a female of the species, is, in the main, based upon the fact that the juror "could not find his hat", on adjournments of court; that he had to be shown his place in the jury box, and that he had become separated from the jury panel. The reasons assigned, thus disqualifying the juror, should not, I think, be accorded judicial sanction by the opposite sex: Jocularly, it is the experience of all of the genus Homo that, at times, even in our homes, in moments of forgetfulness, or carelessness, or in the midst of excitement, we fail to remember "where we put our hats", and are constantly reminded by the partner of the marital union that it is on the customary "hat rack". Seriously, in my opinion, the arbitrary discharge of the juror in this case, for the reasons assigned, is a dangerous precedent in our jurisprudence. It is held generally that, the incapacity of a juror from further service, and the necessity for discharge, are matters requiring a judicial finding, to be heard and determined by judicial methods, and that it is prejudicial error for the court, of its own motion, on mere reports or personal observation, and over the objection of litigants, to determine that a necessity exists requiring the discharge of a juror. In Upchurch v. State, 36 Tex.Crim.R. 624, 38 S.W. 206, 44 L.R.A. 694, the Court of Criminal Appeals of this State, under a statute somewhat similar to our civil statute with reference to the discharge of a juror, in the course of the opinion, said: "* * * conceding that the severe sickness of the wife of a juror is such a circumstance as would authorize the discharge of the jury,—propositions about which we express no opinion, because unnecessary,—still, it was *absolutely necessary to judicially ascertain the fact of sickness before the jury could be legally discharged. This apprehends a judicial finding. It is a step in the progress of his trial, and an important one, so far as defendant's rights are concerned.* * * * Now, in the case at bar the action of the judge was not in open court at all. It was at night, some distance away from the court room, in the absence not only of the jury, but of the prisoner and his counsel. Not only so, but this action was taken on the ex parte statement of an officer of the court that some one had informed him that the wife of the juror Abbott was very sick. Could the court, under such circumstances, make a judicial finding of so important a fact in the progress of this trial,—one which involved the discharge of the jury? If so, the discharge of a juror in any case would appear to be a matter entirely within the arbitrary discretion of the judge,—a power which he could exercise in the absence of the prisoner, and without any judicial procedure to ascertain the fact which would authorize his action. Such arbitrary power would place it entirely within the province of a judge to discharge a jury of his own motion, and without investigation. If, in any given case, he should desire the conviction of a defendant, and it should appear that the jury was not likely to convict, that the state had not entirely made out its case, by his arbitrary discretion he could discharge the jury, and upon a subsequent trial, the state being better prepared, secure a conviction. This was the practice of courts in the days of the Stuarts, but happily not so now. * * * If the court is to find and ascertain the fact which authorizes him to act in discharging a jury, this apprehends a trial,—a trial in open court, in the presence of the accused, and not an ex parte proceeding, at which he is neither present nor consenting." (Italics mine.) So, in the case at bar, the unsoundness of the juror's mind before his discharge, was a necessary judicial ascertainment, and such is not obtained when the trial judge, in a bill of exception, long after the trial of the cause and perfection of appeal, assigns reasons for the discharge of the juror. A trial by a jury of twelve men is a valuable right accorded to litigants by the legislative branch of our Government; and, however laudable the act of the judge may be, in relieving a juror, worried, or sick in mind or body, it is not within the court's power, over the objection of litigants, to discharge such juror, without a trial, reviewable on appeal, to determine the facts of his unfitness. The defendant objected to the discharge, and, in the alternative, asked to be accorded the right to withdraw his announcement of ready, on account of the action of the court. This, at least, I think, presents reversible error.