(No. 33579.— )

ORVILLE P. FOX, Appellant, *vs.* FOX VALLEY TROTTING CLUB, Appellee.

*Opinion filed May 23, 1956.*

IRWIN BLOOM, of Chicago, (WILLIAM C. WINES, of counsel,) for appellant.

GREGORY, GILRUTH & HUNTER, of Chicago, (ROBERT L. HUNTER, and IRWIN T. GILRUTH, of counsel,) for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This cause arrives here from the Appellate Court of the First District as a result of our allowance of a petition for leave to appeal. The plaintiff, the owner of the Aurora Downs race track located at Aurora, instituted his action in equity praying for an accounting of monies due him on a lease of his racing premises with the defendant.

The master in chancery, upon an extensive hearing, recommended a decree allowing plaintiff more than $100,000, including attorney's fees. The chancellor's determination that the plaintiff had no cause of action was affirmed by the Appellate Court.

The defendant corporation is engaged principally in staging harness racing meets and allied activities. The lease provided that the premises "are to be used solely" for the staging of harness races, at which pari-mutuel wagering is to occur, horse shows, rodeos, auctions and the like. The stipulated rental was $25,000 per year plus varying percentages in different years of gross receipts from (a) admission fees, (b) the total amount of stakes wagered on races and (c) receipts from the operation or leasing of concessions. The lease was signed in 1946 and provided for a term of five years with an option to renew which was exercised in 1951.

The defendant staged harness racing meets at plaintiff's track in the years 1947, 1948, 1949, 1950 and 1951. The first three years the lease was increasingly profitable. Defendant then became interested in transferring its operation to the Maywood racecourse, which location offered many advantages and would be vastly more lucrative. Consequently, defendant neglected its operations at plaintiff's track when assured of a lease at Maywood. This it was able to obtain in 1952, and since that date its meets there have been highly successful. Defendant refuses to pay plaintiff any sum other than the $25,000 base rent.

Does the lease oblige the defendant either to stage its meets on the plaintiff's property or to pay damages for staging its meets elsewhere?

The complaint alleged that plaintiff's property had a value of $1,500,000. This allegation was not denied in defendant's answer. The $25,000 base rental would yield only 1⅔ per cent on the investment. The contracting parties knew that the premises had previously been rented for

$70,000 a year. They were well aware that $25,000 per annum would not enable plaintiff to meet the payments on an encumbrance on the property and taxes. They knew that it was contemplated by the parties to the lease that plaintiff's return on his investment would yield $125,000 to $150,000. It is the contention of the plaintiff that the above facts which are undisputed can be properly considered in ascertaining the intention of the parties when the lease under consideration was executed. The defendant argues that the terms of the lease are plain and unambiguous; that there is no express language in the lease which directs that the defendant must conduct racing meets on the demised premises; that therefore there is no basis for an implied covenant; and that all other utterances of the parties as to their relationship are legally immaterial. Plaintiff asserts that the parol evidence rule does not inhibit a court from reading a contract, conveyance or other document in the context of the objective facts and circumstances, as distinct from oral agreements designed to vary the terms of a written instrument.

There are many cases cited in both briefs relating to the propriety and impropriety of considering extraneous facts when construing and interpreting a written document. We shall not be detained in this opinion in undertaking the difficult task of applying and reconciling the many conflicting pronouncements of law in that field.

We find validity in the arguments advanced by the plaintiff that recourse to antecedent, extrinsic, objective facts is not necessary; that it is clear from the terms of the lease itself that the parties intended that the premises "are to be used" for the purposes of meets; that they have not been so used; therefore, there was a clear breach of the express terms of the lease. The language of the lease stripped of its meaningless verbiage so far as "use" of the demised premises is concerned is, "The said demised premises are to be occupied and used solely for purposes

stated below." In the provisions governing the "use" of the premises the language of paragraph (a) is as follows: "Conducting and operating harness racing meets (providing it is conducted and operated in conjunction with pari-mutuel wagering), the term harness racing to have the same meaning as designated by the Illinois Harness Racing Act, known as House Bill No. 142—approved July 17, 1945."

The striking significance of the language "providing it is conducted and operated in conjunction with pari-mutuel wagering" resides in the fact that the parties to the lease máde it clear that the premises were to be used for harness racing where there was to be *pari-mutuel betting* and not racing where there would be revenue from only the gate and concessions. It would seem grotesque for us to assume that the landlord would explicitly refuse permission to conduct the relatively unprofitable racing meets which would yield him only a percentage of admission fees and concession revenue at which no wagering was permitted and yet intend that the lessee might conduct no meets at all. Giving the questioned provision a natural and literal interpretation we are of the opinion that the parties agreed that the premises should not only be occupied but that it should "use" the premises for harness racing. Another provision of the lease which sheds light in support of plaintiff's interpretation reads as follows: "As a special inducement to the Lessor to make and execute this lease, the Lessee covenants to expend or cause to be expended, not less than fifty thousand dollars ($50,000) in repairing and decorating the buildings and altering the track on the said premises, during the first year of the said term." If the lessee did not intend to use the premises for horse racing, this $50,000 would have been money wasted. Why should the parties agree that the lessee should spend $50,000 for something that was not of any benefit to the lessee and of little or no advantage to the lessor?

The lease also provided for the abatement of rents in the event that "gambling" should become illegal in Illinois or Kane County or if, without fault, the defendant should be outlawed for harness racing by the National Trotting Horse Association or any other authorities having jurisdiction thereof. This is highly suggestive of the intention of the parties that the lessee was to conduct racing meets on the demised premises unless legal barriers arose, in which event there was to be no rental whatsoever.

The Illinois Harness Racing Commission not only requires an applicant for a harness-racing license to have a lease but permits the licensee to stage only one meet a year. The parties to the lease surely did not contemplate that the defendant would obtain permission to stage a meet elsewhere when both the lessor and the lessee well knew that by so doing the defendant would be precluded from holding any meet at Aurora Downs. Finally, there is another significant provision of the lease which appears under the clause captioned "Rights to Inspection of Books and Records." Here the plaintiff is given the right to "inspect" the lessee's books and is entitled to "full, true and accurate itemized statements" of the lessee's receipts.

The strongest case cited in support of plaintiff's contentions is *Stoddard* v. *Illinois Improvement and Ballast Co.* 275 Ill. 199. The lessor in this case owned 480 acres of land. Ten acres were leased to lessee for ten years for the purpose of quarrying stone. Lessee was to pay six cents per yard for stone quarried. Lessor was to have the privilege of examining lessee's books whenever desired to verify the accounts rendered. Lessee failed to proceed with due diligence to develop said premises. Suit was instituted by lessor to recover damages for the failure of lessee to carry out its obligation or "failure to develop said premises for quarrying purposes contrary to the intent and meaning of said lease." Lessee contended that the terms of the lease did not explicitly require him to quarry

stone. This court in affirming judgment for lessor said: "It very clearly appears from the provisions of said lease that it is one given for the purpose of quarrying stone. The lessees covenanted to pay as rent or royalty only the price of six cents per cubic yard for stone removed from the premises and nine cents per cubic yard for good rubble stone found and sold by them. The lease was to extend 'as long as the property is suitable for quarrying purposes,' and lessees specially covenanted that the lessor was to have the privilege of examining the books of the lessees whenever he desired, after payments were due, to verify the accounts rendered. The accounts thus mentioned necessarily mean accounts for stone quarried by the lessees and sold, and for the sums due the lessor on such accounting he was to have a lien on all buildings and improvements erected on said premises at any time and on lessees' interest in the lease. In ascertaining the meaning and intent of the lease we are to give meaning and effect to every clause therein, if possible, and from the whole ascertain what is the real intent. We are to suppose, in the first place, that the lease was given for the mutual benefit of the parties, and that they were not joining in a mere nominal lease and using meaningless words and terms as an idle ceremony. If we treat the lease, then, as a lease, there can be no escaping the conclusion that it was given for the purpose of quarrying stone. Defendant in error could receive no rent from the premises by him leased unless stone was quarried. And why should the lessees specially covenant to exhibit their books to verify an accounting if such an accounting was not to be made, and then covenant that the lessor was to have a lien for a claim unless there was to be such a claim? Not only is the lease given for the purpose of having stone quarried from the premises, but there is also just as clearly an implied covenant that the lessees will quarry stone with reasonable diligence if found and so long as found in

quantity and kind that may be quarried at a profit to the lessees."

In the *Stoddard case* the defendant made the argument that while the land was not being quarried the plaintiff had a right to use and occupy it for farming and other purposes and so lost nothing, except the profits from the quarrying enterprise. It is important to note that in the instant case the defendant has not only possession but exclusive possession of the plaintiff's track. The plaintiff in the instant case, unlike the plaintiff in the *Stoddard case,* can make no use of the premises. The fact that plaintiff in the instant case receives a base rental of $25,000 per year is not a valid distinguishing feature, as urged by defendant, since that sum of money is insufficient to pay interest and taxes. Other cases cited supporting plaintiff's view are: *Daughetee* v. *Ohio Oil Co.* 263 Ill. 518; *Seggebruch* v. *Stosor,* 309 Ill. App. 385; *Marvin Drug Co.* v. *Couch,* (Tex. Civ. App.) 134 S.W. 2d 356; *Cissna Loan Co.* v. *Baron,* 149 Wash. 386, 270 Pac. 1022; *Wood* v. *Duff-Gordon,* 222 N.Y. 88; *Selber Bros.* v. *Newstadt Shoe Store,* 194 La. 654; *Mayfair Operating Corp.* v. *Bessemer Properties Inc.* 150 Fla. 132, 7 So. 2d 342. The *Daughetee case* involved an oil and gas lease wherein lessor received $100 per year for the gas product of each well, also one-eighth part of oil produced and a ground rental of 25 cents per acre. This court held that the lease obliged the lessee to exploit its leasehold by digging.

The two cases principally relied upon by the defendant are: *Cousins* v. *Hastings,* 45 Cal. App. 2d 141, 113 Pac. 2d 878, and *Percoff* v. *Solomon,* 259 Ala. 482. In those cases the court held that an implied covenant could not be read into the leases. Significantly, the court said in both cases that implied covenants do not arise unless such becomes indispensable in order to carry out the intention of the parties. Appellee also relies upon another case, *Adkins* v.

*Adams,* 152 Fed. 2d 489, wherein the court of appeals found no basis for the implication of a covenant to explore for oil, and at page 491 used this language: "However, in order that an unexpressed term may be implied, the implication must arise from the language employed in the instrument or be indispensable to effectuate the intention of the parties."

The case before us must be construed so that the intention of the parties may be effectuated. It would lay great strain upon our credulity to think that it was not the intention of the parties to the lease that the lessee was to conduct his racing meet at Aurora Downs. Where there is no express provision in the contract governing the disputed matter, courts are not helpless to discern and give effect to the intention of the parties. The bargain implicit in the defendant's interpretation of the instant case would prove to be a ruinous one as measured in terms of the lessor's interest. Paraphrasing the language in the *Stoddard case,* if we treat the lease as a lease, there can be no escaping the conclusion that it was given for the purpose of (quarrying stone) harness-racing meets.

The briefs of both parties were devoted almost exclusively to a consideration of the above issue and only lightly was the damage issue touched. The master in chancery was in error in some of his calculations. Too much emphasis was placed by him on the figures which revealed the defendant's highly successful operations at the Maywood track. There are so many obvious advantages in holding a meet at Maywood that the results there are not a conclusive indication as to what could have been expected at Aurora. The measure of damages would be the compensation for the loss suffered as a result of the breached lease, taking into consideration the history of the operations on plaintiff's premises,—bearing in mind the finding of the master that defendant lacked enterprise and promotional

zeal during the later years because of the contemplated move to a better location.

The defendant in its lease agreed to pay attorney's fees in the event of a breach or default in the covenants of the lease. Holding as we do that the defendant did breach the lease, it follows that attorney's fees were properly assessed.

The decree is reversed and the cause is remanded to the circuit court of Cook County, with directions for a further hearing on the damage issue.

*Reversed and remanded, with directions.*