766 F.2d 1136
 13 Collier Bankr.Cas.2d 115, Bankr. L. Rep. P 70,642
 In the Matter of GOLDBLATT BROS., INC., Debtor.
Appeal of BENEFICIARIES OF AMERICAN NATIONAL BANK AND TRUST
COMPANY OF CHICAGO LAND TRUST NO. 7906.
 No. 84-1814.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 5, 1985.
Decided July 8, 1985.
 
 Richard M. Bendix, Schwartz, Cooper, Klob & Gaynor, Chicago, Ill., for appellant.
 Gerald F. Munitz, Nachman, Munitz & Sweig, Ltd., Chicago, Ill., for appellee.
 Before CUDAHY and ESCHBACH, Circuit Judges, and MORTON, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 The question before us is whether the district court properly affirmed a bankruptcy order that approved a debtor's assumption of an unexpired lease over the landlord's objection. The debtor, Goldblatt Bros., Inc. ("Goldblatt") rented a store from the beneficiaries of American National Bank & Trust Company of Chicago, as Trustee under Trust No. 7906 ("American"), under a lease executed in 1957 and amended in 1977. On June 15th, 1981, Goldblatt filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. Sec. 365(d)(2), American filed an application in the Bankruptcy Court to compel Goldblatt to assume or reject the lease. After Goldblatt notified American of its intention to assume the lease, American objected on the grounds that Goldblatt had not met the conditions precedent to assumption of the lease set forth in Secs. 365(b)(1) and 365(b)(3) of Chapter 11. On August 9, 1983, the Bankruptcy Court entered an order overruling American's objections and approving Goldblatt's assumption of the lease. Mem. and Order, No. 81 B 7075 (N.D.Ill. Aug. 9, 1983). The district court affirmed in a Minute Order, No. 83 C 4326 (N.D.Ill. April 27, 1984) and American appeals. We affirm.
 
 
 2
 The amended lease obligates Goldblatt to pay American $180,000 in base rent annually, as well as percentage rent of up to 3% of gross sales. Percentage rent becomes due only when sales exceed certain specified amounts. Goldblatt agreed in Article V of the lease that it would "use, occupy and maintain the demised premises solely for a store for the sale, at retail, of general merchandise including foods." It also promised to conduct its business "continuously, without interruption, keeping the demised premises open for business during all hours when a majority of the other [Chicago Goldblatt] stores remain open for business...." During the bankruptcy proceedings, however, the store was closed for about two months (between January and March of 1982), apparently for remodeling. When it reopened, Goldblatt discontinued using the second floor of the store for retail sales, and confined its sales area to the first floor, which represents about 50% of the total rented space.
 
 I.
 
 3
 Section 365(b)(1) of the Bankruptcy Code provides that where there has been a default by the debtor under an unexpired lease, the trustee may not assume that lease on behalf of the debtor unless the trustee first cures the default, compensates the other party to the lease for damages resulting from the default and provides adequate assurance of future performance under the lease.[1] One of American's principal objections to Goldblatt's assumption of the lease is its contention that Goldblatt's failure to use the second floor of the store constituted a "default" under Sec. 365(b)(1), for which American had to be compensated prior to assumption. Specifically, American argues that the provisions of the lease obligating Goldblatt to use the rented premises "solely" for a retail store, and to operate its business "without interruption" require Goldblatt to use all of the rented space for retail sales.
 
 
 4
 Clearly, under Illinois law, an exclusive use restriction can be violated not only by prohibited uses but also by a commercial tenant's failure to operate its business on the leased premises. See Fox v. Fox Valley Trotting Club, 8 Ill.2d 571, 134 N.E.2d 806 (1956); Simhawk Corp. v. Egler, 52 Ill.App.2d 449, 202 N.E.2d 49 (1964), appeal denied, 31 Ill.2d 630 (1965). Generally, cases finding such a violation involve tenants who cease doing business entirely and abandon the premises, thus violating their agreement to "use" the premises solely for operation of their business. This case is somewhat different, since Goldblatt has continued to use the rented store to sell retail items during normal business hours, but has simply stopped using the second floor for sales.[2] American nevertheless argues that, at least where a lease requiring partial percentage rent is involved, exclusive use and continuous operation provisions require a tenant to occupy leased premises in their entirety. Since Goldblatt is not obligated to pay percentage rent until a given level of sales is achieved, and since its 50% reduction in selling area presumably diminishes its total sales volume, American argues that Goldblatt has disabled itself from paying percentage rent just as surely as if it had ceased operations entirely. Therefore, Goldblatt has, under the rationale of the cited cases, violated the lease. American contends that any other rule would allow a tenant to use only a "few square inches of space" for the intended use as long as it continued to pay base rent, thereby frustrating the landlord's legitimate expectation of receiving percentage rent.
 
 
 5
 We do not agree that anything less than complete occupancy of rented retail space necessarily constitutes a material breach of a partial percentage rent lease. Certainly the cited cases do not establish so broad a proposition. Unlike the situation in which a tenant completely shuts down operations, here the lease provisions are not literally violated: the store is in fact being operated "continuously," albeit on a smaller scale, and it is "being used solely" for a store at retail, even though not all the space is devoted to sales. We do find some merit in American's argument that a tenant is obligated to make good faith efforts to generate the amount of rent, including percentage rent, contemplated in its lease, see Goldblatt Bros., Inc. v. Addison Green Meadows, Inc., 8 Ill.App.3d 490, 290 N.E.2d 715 (1972), but we do not think a mere failure to use all the rented space for sales is necessarily inconsistent with such an obligation. A variety of circumstances can be imagined in which a retail tenant might reasonably expect that some reduction in selling area would aid, rather than deter, its sales efforts. In general, of course (and with the obvious qualification that the tenant is presumably interested in the net while the landlord may be oriented to the gross) maximizing profitable sales is in the tenant's best interest as well as the landlord's. Therefore, as long as the tenant does not violate the explicit requirements of the lease, we think it is entitled to some discretion to exercise its business judgment in deciding how best to achieve its goal.[3]
 
 
 6
 This is not to imply, however, that a failure to use a portion of rented space for the intended use can never constitute a breach of exclusive use or continuous occupancy lease provisions. At least given a partial percentage rent requirement, we agree with American that some reasonable occupancy requirement defined by area, as well as by time, can fairly be implied. Thus if a tenant were to discontinue using all but a tiny portion of the rented premises, drastically reducing sales, this could well violate a percentage rent lease even if the tenant remained open during normal business hours. See Seggebruch v. Stosor, 309 Ill.App. 385, 33 N.E.2d 159 (1941) (tenant's reduction in sales of gas from 12,000 to 200 gallons per month violated implied covenant of reasonable diligence). Yet, as we have noted, the mere failure to use every foot of available space for sales should not be considered a default. Between these two extremes, we think each case must turn on its own facts particularly noting the reasonable expectations of the parties under all the circumstances.
 
 
 7
 In this case, we agree with the bankruptcy court that the lease does not require that all the rented space be used for sales. The lease contained no promise by Goldblatt to maintain any particular volume of business or even to use best efforts to maximize sales. Significantly, unlike some leases, the percentage rent payable was not tied in any way to selling area. The base rent was very substantial and was payable in addition to (rather than in lieu of) the percentage rent, which was comparatively minor. The lease explicitly allowed Goldblatt to make alterations and nonstructural changes to the premises at its own expense, without approval by American unless the cost of such alterations exceeded $5000. Thus presumably Goldblatt was free to make at least minor changes affecting the available sales area. All these factors persuade us that the parties did not intend to fix selling area as a guarantee of percentage rent.
 
 
 8
 Moreover, there was undisputed testimony in the record that Goldblatt stopped using the second floor for sales because it had discontinued certain product lines; that it then began using the second floor as a marking area; and that it did have plans to use the space, although they had not been completed. Thus, unlike the cited cases, there is no suggestion that Goldblatt stopped using the space in any bad faith attempt to reduce sales volume; the most reasonable inference is rather that it was trying to streamline its sales efforts as part of the reorganization. Under these circumstances we hold that Goldblatt's failure to use the second floor for sales was not a default requiring cure and compensation under Sec. 365(b)(1).[4]
 
 II.
 
 9
 American also argues that the courts below erred in concluding that the store rented by Goldblatt under the lease is not part of a shopping center. American seeks to characterize the "Belmont Stores" (eight stores, including Goldblatt's, which are commonly owned and located in the same block, and seven of which are contiguous) as a shopping center in order to invoke the special protections available to shopping center landlords under 11 U.S.C. Sec. 365(b)(3). The term "shopping center" is not defined in that statutory provision, but is left to case by case interpretation. American's expert witness testified that the Belmont stores form a strip shopping center, basing his opinion on the satisfaction of three criteria: common ownership of contiguous parcels, the existence of an "anchor tenant" (Goldblatt) and joint off-street parking adjacent to all stores. The bankruptcy court rejected this definition, however, noting that it was sufficiently broad to include many commercial buildings containing two or more tenants that clearly are not shopping centers. It required the landlord to come forward at least with some proof that the premises at issue had been purposefully developed as a shopping center.
 
 
 10
 We agree with the courts below that the evidence presented by American was insufficient to demonstrate that Goldblatt was a tenant in a shopping center. Although the criteria urged by American certainly are significant, we believe they are not in and of themselves determinative here. As the bankruptcy court stressed, there is no evidence whatsoever that the stores were developed to be a shopping center. Moreover, typical indicia of shopping centers, such as a master lease, fixed hours during which the stores are all open, common areas or joint advertising, are noticeably absent. For these reasons we find no error in the courts' conclusion that Sec. 365(b)(3) was inapplicable to Goldblatt's assumption of the lease.
 
 III.
 
 11
 American's final argument is that the bankruptcy court erred in excluding evidence of actual percentage rent paid under the amended lease as well as projections of percentage rent that allegedly would have been payable if Goldblatt had not stopped using the second floor of the store for sales. The bankruptcy judge held that this evidence was not relevant, since it pertained only to damages resulting from the non-use of the second floor, and the judge had already determined that the non-use was not a default under the lease requiring any compensation. He invoked FEDERAL RULE OF EVIDENCE 403 to support his decision that the probative value of the testimony was outweighed by the potential for confusion of the issues or undue delay. Since we have affirmed the lower court's conclusion that no default occurred, it is obvious that evidence about damages resulting from such a default was indeed irrelevant. American did not contend at the hearing that the percentage rent evidence was relevant to the default issue, but only to damages. Therefore we see no error in excluding it.
 
 
 12
 For the foregoing reasons the order of the district court is AFFIRMED.[5]
 
 
 
 *
 Honorable L. Clure Morton, Senior District Judge for the Middle District of Tennessee, is sitting by designation
 
 
 [1]
 Section 365(b)(1) provides in full:
 (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
 (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
 (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
 (C) provides adequate assurance of future performance under such contract or lease.
 11 U.S.C. Sec. 365(b)(1).
 
 
 [2]
 There are brief references in the Bankruptcy Court's order and in the hearing transcript to the use of a small portion of the second floor as a dental clinic. During oral argument the parties were unable to provide this court with any verification of, or further information about, this alleged use. Counsel for American, however, stated that to his knowledge Goldblatt was not subletting any portion of the store for such a use. Of course, the demonstrated existence of a sublease or Goldblatt's use of a portion of the premises for a dental clinic might present us a very different case, since such a use would seem inconsistent with the agreement to use the store "solely" for retail sales. Because there is nothing further in the record on the point and since American in no way relies on this reference to support its appeal, however, we do not consider this issue further
 
 
 [3]
 We emphasize in this regard that the lease does not include any provision requiring that a specified portion or percentage of the retail area be used for actual "sales," as distinguished from ancillary functions such as storage, administrative offices, customer service, etc. We see no reason why a landlord particularly concerned with such matters could not bargain for a clause requiring "complete use" for actual sales or something similar. Cf. Fox v. Fox Valley Trotting Club, 8 Ill.2d 571, 134 N.E.2d 806 (1956) (landlord limited use of rented race track to only races run in conjunction with betting, to ensure sufficient percentage rent)
 
 
 [4]
 American also contends that the complete closure of the store between January and March of 1982 constituted a default under the continuous operation clause of the lease, although it does not urge this point as a separate ground for reversal. Although American characterizes the shutdown as a "complete abandonment" of the premises, the only testimony in the record on this point was offered by a vice-president of Goldblatt who testified that during the relevant period "the store was closed down and relaid subject to order of the court and then reopened...." Tr. at 8. We think it is clear that the continuous operation clause of the lease is not violated by every temporary cessation of business, no matter what the circumstances. Indeed, the lease itself states that "[a]nything herein contained to the contrary notwithstanding, Tenant may temporarily close or suspend operation of its business ... for the purpose of making alterations, rebuilding, replacement, changes, additions and improvements...." The testimony presented by Goldblatt seems sufficient to support the inference that the temporary shutdown was for the purpose of remodeling and was authorized by the court. We think it was American's burden to refute this testimony at the hearing if it could or to explain why a temporary court-authorized shutdown violates the lease. On the record before us we are unwilling to conclude that the shutdown was a default
 
 
 [5]
 Given our conclusion on the merits, we decline to reconsider this court's prior denial of Goldblatt's motion to dismiss the appeal