AUTOMATIC LAUNDRY SERVICE, INC. *v.* DEMAS
ET AL., INDIVIDUALLY AND TRADING AS
IDEAL TRAILER CAMPS

[No. 165, September Term, 1957.]

*Decided May 10, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, PRESCOTT and HORNEY, JJ., and BOYLAN, JR., Chief
Judge of the Fifth Judicial Circuit, specially assigned.

*Lawrence I. Weisman* and *M. Peter Moser*, with whom
were *Nyburg, Goldman & Walter, Brodnax Cameron* and
*Cameron, Close & Reed* on the brief, for appellant.

*George L. Clarke* and *A. Freeborn Brown*, with whom
were *Howard S. O'Neill, George W. White, Jr.*, and *Buck-
master, White, Mindel & Clarke* on the brief, for appellees.

BRUNE, C. J., delivered the opinion of the Court.

This suit was brought in September, 1954, by the appellant,
Automatic Laundry Service, Inc. ("Automatic") against the
appellees, Nicholas Demas and his son James Demas (usually
referred to below separately by their respective first names
and collectively as the "Demas") for an injunction and an
accounting. The bill was dismissed after a trial by a decree
of the Circuit Court for Harford County entered on July 15,
1957, and Automatic appeals from that decree.

In 1951 Automatic entered into an oral agreement with one
Middleton, who was then the owner of a trailer park at Aber-
deen, Maryland, known as the Ideal Trailer Park (the
"Trailer Park") under which Automatic installed, maintained
and operated several coin operated washing machines in the
laundry room of the Trailer Park and paid Middleton 15%
of the receipts therefrom. In 1952 Nicholas bought the
Trailer Park from Middleton and the agreement which Mid-
dleton had made with Automatic continued as between Au-
tomatic and Nicholas until June 17, 1953. On that date the
written agreement upon which this suit is based was entered
into following negotiations conducted by James and by one
Gerry Weiss, the president of Automatic. This agreement
was between Automatic and Ideal Trailer Park. The bill
alleged that Nicholas and James were copartners trading as

Ideal Trailer, but this was denied by both defendants. There was a great deal of confusion about the contract. Automatic was unable to produce a copy from its own records and alleged in the bill that it was for a term of two years. A copy produced by the defendants showed that it was for a term of five years. On the evidence presented in the trial court by witnesses who were seen and heard by the Chancellor, he found that the agreement was for a term of five years and that it was signed on behalf of Nicholas by James as agent for his father. We have reviewed the evidence, which was conflicting in some respects, and find no sufficient basis for overturning these findings of fact.

The contract provided for the lease by Automatic to the Trailer Park (of which the Chancellor, in effect, found Nicholas to be the proprietor) of four washing machines of specified types. These were new machines which were installed to replace old ones which had been on the premises since 1951. The contract required Automatic to install them and to connect them with the Trailer Park's plumbing outlets. It also required Automatic to maintain the machines in good operating condition, to answer service calls, to make collections and to remit monthly "commission checks" to the Trailer Park. The contract further provided that the machines should be equipped with coin meters requiring the insertion of 25¢ for laundering a load of wash and that Automatic should pay to the Trailer Park monthly a commission equal to 25% of the gross receipts of each machine. Under another clause of the contract Automatic agreed to "install in the premises a sufficient number of machines to render adequate service to the premises," and it was further agreed that "any machines installed after the date of this contract shall be subject to the term hereof provided Proprietor [the Trailer Park] be notified, in writing, of the installation of such machines." Automatic agreed to paint the laundry at its expense and did so at a cost of about $50.00.

On its side the Trailer Park agreed "to furnish appropriate accessible space for the machines, all electric current, gas and hot and cold water necessary for the operation of the ma-

chines" and "not [to] remove nor permit the removal of said machines from the precise location specified hereinabove."

The contract, as the Chancellor found, was to continue for a period of five years; and it provided for automatic renewals thereafter for successive one year terms, unless notice of termination should be given thirty days before the expiration date of any term.

In November, 1953, Nicholas turned over to James what had been a bathroom in the same building as the laundry. James converted this for use as a second laundry and installed several new washing machines, which were thereafter operated in competition with those belonging to Automatic. Automatic, through its counsel, protested this competition as a violation of the contract. James referred the letter to counsel who replied that he could not detect any violation of the agreement. In further correspondence the same counsel, on behalf of Nicholas, advised Automatic's counsel that Automatic's contract was with James, not with Nicholas, that Nicholas, and not James, was operating the machines, that James had no control over Nicholas and hence was not liable to Automatic.

The effect of the installation of the competing machines on Automatic's receipts was to cut them from an average of a little over $103 a month for four preceding months to an average of less than $2.50 a month for the first six months of 1954. Automatic then cut its rates from 25¢ to 10¢ for the use of its machines and its revenues increased to between $10.40 and $32.50. During the three years prior to the trial, the gross monthly rentals of the Demas' machines averaged about $40.00.

After Automatic reduced its rates, Nicholas notified Automatic that he had retaken the space formerly leased to his son and that Automatic would have to remove its machines by August 31, 1954. Institution of this suit followed on September 15, 1954. The relief sought is an injunction against interference with the maintenance and operation of Automatic's machines, the removal of the Demas' competing machines from the Trailer Camp, an accounting, and the customary "other and further relief."

The Chancellor construed the contract as not prohibiting the installation of other machines on the premises. He pointed out that there was no express prohibition to that effect, that the agreement was prepared by Automatic and relied upon the rule that in case of doubt or uncertainty the agreement should be construed most strongly against the party who prepared it. He regarded the case as distinguishable from *Belvedere Hotel Co. v. Williams,* 137 Md. 665, 113 A. 335, and *Keating v. Preston,* 42 Cal. App. 2d 110, 108 P. 2d 479.

The questions presented on this appeal (in addition to the claim already disposed of 'that the Chancellor's finding with regard to the making of the contract was erroneous) are these: first, did the Demas grant to Automatic an exclusive right to maintain and operate washing machines at the Trailer Park; second (in the absence of a grant of an exclusive right), did the profit-sharing feature of the contract imply a duty on the part of the Demas to refrain from destructive competition with Automatic; third, is Automatic entitled to an injunction to prevent the physical removal of its machines; and fourth, did Automatic waive any right which it might have had by its failure to sue and its active competition with the Demas for nine months?

Just why Automatic elected to cast its customary, printed agreement in the form of a lease of washing machines is not wholly clear and is not explained, but the substance of the agreement is of greater importance than the form. Automatic claims that it acquired an exclusive right to what it calls a "concession". It is quite plain that there is no express grant of an exclusive right, and any such right would, therefore, have to arise, if at all, by inference. Though we are somewhat inclined to the view that such an inference should be drawn, we do not find it necessary to decide the question, for we think that the duty of loyalty to refrain from destructive competition is sufficiently established and was clearly violated at least by Nicholas, and damages are shown to have accrued from this breach.

In the first place, the agreement is one to share profits on the basis of gross receipts, and in the next place Automatic

is obligated to install enough machines to render adequate service to the premises. The evidence shows that the Trailer Park had a capacity of some twenty-four families. The Demas contend that the laundry facilities at the Trailer Park also served members of the Aberdeen community not residing at the Park. The figures as to earnings after Nicholas' or the Demas' competing machines were installed show that there was no need for a second group of machines to fulfill Automatic's obligation, and that the profit to Automatic under its agreement with Nicholas was almost wiped out.

*Corbin on Contracts*, Vol. 3, § 568, pp. 200-201, states with regard to the doctrine of implication: "In any commercial agreement in which the compensation promised by one to the other is a percentage of profits or receipts, or is a royalty on goods sold, manufactured or mined, there will nearly always be found an implied promise of diligent and careful performance in good faith and of forbearance to make performance impossible by going out of business or otherwise."

The appellant also relies upon *Lippman v. Sears, Roebuck & Co.*, 44 Cal. 2d 136, 280 P. 2d 775; *Wilson Sullivan Co. v. International Paper Makers Realty Corp.*, 307 N. Y. 20, 119 N. E. 2d 573; *Seggebruch v. Stosor*, 309 Ill. App. 385, 33 N. E. 2d 159; and *Fox v. Fox Valley Trotting Club*, 8 Ill. 2d 571, 134 N. E. 2d 806; and we think that these cases support Automatic's contention. The *Seggebruch* case seems particularly in point. The defendant leased a gasoline station from the plaintiff at a rental of 1-¼¢ per gallon of gasoline sold. For the first two years of the lease the average rental was about $140 per month. The defendant then acquired an adjoining lot, erected a new gasoline station on it and virtually abandoned the plaintiff's station. It was held that although there was no express covenant in the lease that the defendant would use reasonable diligence in operating the plaintiff's station, it was clearly implied that he should do so. Good faith is required and this is so even though there may be a specific minimum rental provision. See *William Berland Realty Co. v. Hahne & Co.*, 26 N. J. Super. 477, 98 A. 2d 124, affd. in part and rev. in part, 29

N. J. Super. 316, 102 A. 2d 686, in which good faith was found to be present in a case in which a department store had a sound economic reason for transferring a part of its business from a store which it occupied under a guaranteed minimum and percentage of sales lease to another building across the street.

The implication of an obligation even though the obligation is not fully spelled out in the contract is no novelty in Maryland law. See *Ziehm v. Steil Brewing Co.,* 131 Md. 582, 102 A. 1005; *Hendler Creamery Co. v. Lillich,* 152 Md. 190, 136 A. 631, and *Foster-Porter Enterprises v. De Mare,* 198 Md. 20, 81 A. 2d 325. In the *Ziehm* and *Hendler Creamery* cases an implied covenant by a manufacturer to sell its products to a dealer who agreed to sell the manufacturer's products exclusively was found. In the *Foster-Porter Enterprises* case an obligation to use its best efforts to market a baseball pitching device was implied from the fact that one of the parties undertook to act as distributor for such products. These cases accord with, and both the *Hendler Creamery* and *Foster-Porter Enterprises* cases cited with approval *Wood v. Lucy, Lady Duff-Gordon,* 222 N. Y. 88, 118 N. E. 214, in which Judge Cardozo said: "The law has outgrown its primitive state of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed * * *."

We are of the opinion that under the contract Nicholas J. Demas had an obligation not to render valueless his contract with Automatic by permitting the destructive competition here shown to have been created by the introduction of the competing machines. James had full knowledge of the contract, and it seems that he was a knowing participant in the breach by Nicholas and may be properly held accountable in this suit for any profits which he may have derived from the improper competition.

In view of the lapse of time which has occurred, it may be doubtful that any injunction which might now be issued

would serve any useful purpose, since the expiration of the five-year lease is close at hand. However, we think that an accounting for profits is in order, and that, for that reason, the case cannot be considered moot. *Tolman Laundry, Inr. v. Walker,* 171 Md. 7, 187 A. 836.

The last two questions sought to be raised on this appeal— the appellant's right to an injunction against removal of its machines (which would seem now to be on the verge of becoming moot) and the alleged waiver of contract rights by Automatic (which the appellees seem to regard as including Automatic's departure from the 25¢ price stated in the contract) have not been decided by the trial court, but it may be helpful on the remand of the case to indicate briefly our views with regard thereto. Rule 885, Maryland Rules. We think that what we have said as to the obligation of the owner of the Trailer Park to refrain from destructive competition with Automatic would be equally applicable to the protection by injunction of Automatic's right to maintain the machines on the premises until the expiration of the contract.

As to waiver or breach of the contract by Automatic, we do not find anything in the evidence which would indicate any waiver on the part of Automatic. It delayed suit, it is true, but there is nothing to show anything in the nature of an estoppel or any consideration for a waiver. Clearly, there was no rescission or termination of the contract by mutual consent. Automatic continued to make payments under the contract to Nicholas and Nicholas continued to accept them at least up to June, 1954. The Demas' claim that these payments were as referable to the 1951 oral agreement as to the 1953 contract is untenable in the face of the Chancellor's finding and in the face of the fact that a higher percentage of receipts was payable and was paid under the 1953 agreement than under the 1951 arrangement. Automatic's reduction of rates was forced upon it by Nicholas' competition. It probably operated to mitigate damages, as the appellant claims. Whatever effect it may have had can be considered in the accounting proceedings to be had on the remand of the case.

In accordance with the above views, the decree will be re-

versed and the case remanded for further proceedings not inconsistent with this opinion.

> *Decree reversed, with costs to the appellant; and case remanded for further proceedings not inconsistent with the opinion herein.*