# DUPONT HEIGHTS LIMITED PARTNERSHIP, Plaintiff,

v.

# The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Defendant.

## Civil No. PJM 96–544.

United States District Court, D. Maryland.

Dec. 20, 1996.

---

4. In *Deliver It v. Mitchell,* 28 V.I. 25 (Terr.Ct. 1992), the trial court applied TERR CT.R. 65, refusing to vacate the default judgment because the motion was not timely filed under Rule 65 and the movant did not request leave of court to file. The application of these rigid procedural requirements in the Small Claims Division is not consistent with the goal of achieving justice for unsophisticated litigants in the Small Claims Division. *Deliver It* is thus rejected to the extent it is inconsistent with the rule set forth in this case.

We also observe that appellant's motion was filed in the Small Claims Division by counsel. "Neither party may be represented by counsel and parties shall in all cases appear in person except for corporate parties, associations, and partnerships which may appear by a personal representative." V.I.CODE ANN. tit. 4, § 112. We do not interpret section 112 to mean that corporate parties may be represented by counsel in the Small Claims Division. However, the usual rule that a corporation may not appear *pro se* may be relaxed in accordance with the purpose of Rule

64 to allow a corporation to be represented in the Small Claims Division by an officer or shareholder, even if that officer or shareholder is an attorney.

We reject any contrary interpretation of *Carr v. Pena,* 432 F.Supp. 828 (D.V.I.1977) and *Deliver It v. Mitchell* because this interpretation allows quick and inexpensive resolution without interfering with any constitutional rights; legal counsel may be utilized should the case be transferred to the regular Civil Division or appealed.

5. Courts apply a three part test to determine whether a party will succeed in defending against a default judgment: (1) will vacating the judgment visit prejudice upon the plaintiff, (2) does the defendant have a prima facie meritorious defense, and (3) was the default judgment the result of the defendant's culpable or inexcusable conduct. *Zawadski De Bueno v. Bueno Castro,* 822 F.2d 416, 419–20 (3d Cir.1987). The Small Claims court should apply this tripartite test more as a guideline under Rule 64, rather than a strict rule of law.

. Dale A. Cooter, Gerald Frederick Chapman, Cooter, Mangold, Tompert, & Chapman, P.C., Washington, DC, for Plaintiff.

Deborah Brand Baum, Lori Vaughn Ebersohl, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for Defendant.

## OPINION

MESSITTE, District Judge.

### I.

Dupont Heights Limited Partnership sues Riggs National Bank of Washington, D.C. alleging breach of contract and breach of an alleged duty of good faith and fair dealing in connection with a real estate development loan Riggs made to Dupont[1]. Riggs has moved for summary judgment. Having considered Dupont's opposition and the parties' oral arguments, the Court will grant Riggs' Motion.

### II.

█ In order to prevail, a party moving for summary judgment must show the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where, as here, the nonmoving party bears the ultimate burden of persuasion at trial, "the burden on the moving party (at the summary judgment stage) may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," "the plain language of Rule 56(c) mandates the entry of summary judgment." *Celotex Corp.,* 477 U.S. at 322, 323, 106 S.Ct. at 2552, 2553. "[T]rial judges have an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Fred Menke's Car Store v. Volvo North America Corp.,* 698 F.Supp. 1287, 1292 (D.Md.1987).

### III.

These facts are undisputed:

A) Dupont Heights Limited Partnership, a Maryland entity, was formed for the purpose of developing land in Prince George's County, Maryland, in particular the construction and sale of residential townhouses. Riggs National Bank of Washington D.C. was the commercial bank Dupont engaged to finance the project. On June 24, 1994, Stewart Mechanic, President of Royal Stewart Homes, general partner of Dupont, closed a $2.9 million loan with Riggs.

The Loan Agreement provided that Dupont would use the proceeds of the loan to acquire the land and construct 56 townhouse units. The Commitment Letter contemplated a $1,175,920.00 acquisition and development component and a $1,724,080.00 revolving construction component. Unless extended in writing by Riggs, the loan was scheduled to mature on December 24, 1995.

As a condition to closing, Riggs required an appraisal showing a finished market value of the project that would result in an "As Is" loan to value ratio (LVR) on the raw land of not more than 65%, an "As Is" LVR on the developed land of not more than 75%, and an LVR on the land with the townhouse construction of not more than 80%. The Commitment Letter and the loan documents were silent as to whether Riggs was obliged to provide Dupont with a copy of the appraisal or with documents underlying its loan-to-value calculations. Although Dupont asked for a copy of the original appraisal prior to closing and did not obtain it, it went forward with closing notwithstanding. After a second appraisal was completed in early 1995, Dupont received a copy of the new appraisal as well as a copy of the original one.

Among its undertakings under the Loan Agreement, Dupont warranted that it would record the approved plan by September 30, 1994 and commence site development work on the project within the earlier of a) 30 days after permits were issued or b) November 30, 1994. It also undertook to pursue the

---

**1.** Dupont has withdrawn a third count alleging fraud.

development and construction of the improvements with "diligence and continuity."

Riggs agreed to issue any letters of credit that Prince George's County authorities might require to bond the project.

The Loan Agreement contained several provisions regarding requests for draws on the loan. Dupont was to submit requests not more frequently than once a month and at least ten business days in advance in order to permit Riggs' designee to inspect the project as Riggs might deem appropriate. For its part, Riggs agreed that its inspector would proceed "without unreasonable delay" and, upon receiving a satisfactory certificate from the inspector, that it would approve and make an appropriate advance. The Agreement provided that Riggs had no obligation to make advances in the event of Dupont's default, but that should such an advance be made, it would not be deemed a waiver of any conditions precedent to making further advances and would not preclude Riggs from declaring a default for any future act of Dupont.

Among the events of default set forth in the Deed of Trust would be Dupont's failure to record a plat of subdivision reflecting 56 approved townhouse lots and its failure to deliver evidence of recording of the approved plat by September 30, 1994 (unless such events of default were expressly waived or extended in writing). In case of default, Riggs reserved the right not only to suspend any obligation to make advances but also to terminate the Agreement and declare the principal balance plus accrued items due and payable.

The Agreement stated that all conditions pertaining to Riggs' obligation to make advances were imposed solely and exclusively for the benefit of Riggs and that no other person would have standing to require satisfaction of such conditions.

The Agreement provided that it could not be amended, changed or waived orally; only an instrument in writing signed by the party against whom enforcement was sought would suffice. The Agreement was to be governed by the laws of the State of Maryland.

B) Dupont did not record its final plat by September 30, 1994; that did not occur until mid-December 1994. Prince George's County, moreover, did not approve the anticipated 56 townhouse units for the project, it approved only 48. Even so, the parties went forward with the project. On January 27, 1995 Dupont asked Riggs for a letter of credit to post as a bond for grading work at the site and on January 30 Riggs issued the letter.

Prince George's County, as it happened, found the letter of credit unacceptable and rejected it. Ostensibly the County acted because Riggs already had a number of letters of credit outstanding on Prince George's County projects. Riggs contends (and there is no evidence to the contrary) that it was surprised by this turn of events, but in any event it moved promptly to issue a new letter of credit to a bonding company to collateralize bonds that the bonding company in turn posted with the County. The County accepted the substitute bonds 28 days after having rejected Riggs' letter of credit.

During the spring and summer of 1995 Dupont submitted a total of five draw requests which Riggs disbursed along the following timeline:

| DATE OF DISBURSEMENT REQUEST | AMOUNT REQUESTED | DATE OF DISBURSEMENT |
|---|---|---|
| 3/16/95 | $ 51,003 | 4/10/95 |
| 3/28/95 | $ 50,772 | 4/20/95 |
| 5/17/95 | $260,092 | 6/1/95 |
| 7/11/95 | $ 53,009 | 8/13/95 |
| 8/22/95 | $ 18,932 | NOT FUNDED |

During this period, Riggs loan officers pressed Dupont on a number of issues. These included such matters as the minimum investment Dupont was to make in the project, the cash investment to be made by partners of the limited partnership, LVR's, the number of lots approved by the County and the timing and progress of development work.

In the spring and summer of 1995, judging that LVR's did not appear to be in compliance with its requirements, the bank advised Dupont that it was necessary to restructure the loan. Dupont claims it requested copies of Riggs' LVR calculations, but the bank was unwilling to disclose them. In any event, the parties agreed upon revised budgets for vari-

ous categories of disbursements and Riggs sent Dupont an "in compliance" letter. Soon after, however, Riggs had an apparent change of heart, determining that, in order to achieve compliance, Dupont would have to come up with an additional equity infusion of $18,000.

By this time Dupont was ready to end its relationship with Riggs. By July, unbeknownst to Riggs, Dupont was well into negotiations with Columbia Bank to refinance the project. As far as Stewart Mechanic, Dupont's principal, was concerned, whatever Riggs had in mind to do was immaterial. Mechanic's only interest was in refinancing. In fact, by the end of July, Dupont had received a tentative commitment letter from Columbia Bank. Despite this, on August 22, 1995, some three weeks later, Dupont made its final draw request on Riggs. Soon after Dupont informed Riggs that it would be refinancing the loan with Columbia Bank and by October 1995 the Columbia refinancing had taken place. The August draw request on Riggs was never funded. Dupont paid off the Riggs loan out of the new loan proceeds from Columbia.

Dupont filed the present suit against Riggs in January 1996. As of June, 1996, it had yet to construct a townhouse unit on the property.

### IV.

In the first count of its Complaint, Dupont alleges that Riggs' breached its Agreement with Dupont by failing and refusing to make disbursements according to the Agreement's terms. Dupont claims the Agreement provided for a ten day turn-around between Dupont's request for an advance and Riggs' obligation to fund the request and that Riggs breached this term because every disbursement it made exceeded the ten-day requirement. Moreover, says Dupont, the draw request of August 22, 1995 was never funded. Riggs contends that the Agreement did not require it to fund every draw request, particularly where, as here, there had been a default by Dupont. It further argues that the Agreement imposed no obligation upon it to fund draw requests within 10 days.

Dupont supports its claim for a breach of the duty of good faith and fair dealing in several ways. Riggs allegedly breached by refusing to provide Dupont with a copy of the appraisal upon which Riggs relied prior to the closing of the loan; by arbitrarily calculating LVR's and refusing to share its computations with Dupont; by falsely representing to Dupont that it was approved to issue letters of credit to Prince George's County; by creating substantial uncertainty as to the future funding of the loan by arbitrarily and simultaneously advising Dupont as to the status of its compliance with Riggs requirements; and by refusing, without justification, to continue funding under the loan. Riggs' response is that Maryland does not recognize an action for breach of a duty of good faith and fair dealing under the circumstances of this case. In any event, it specifically denies an obligation to have provided Dupont with a copy of the appraisal and or that it acted in bad faith with regard to its loan-to-value calculations, its alleged statements regarding letters of credit, and its actions regarding the funding or nonfunding of the draw requests.

### V.

■ The sole basis for Dupont's breach of contract claim is that Riggs was untimely in funding Dupont's draw requests. The only reference in the Loan Agreement to time in connection with the funding of draw requests appears at Section 2.02(c), which provides:

c) Borrower shall submit Draw Requests for advances of Loan proceeds not more frequently than once a month. Draw Requests shall be delivered to Lender at 808 17th Street, N.W., Washington, D.C., or at such other place as Lender may designate. Each Draw Request shall include the same trade and other categories of budget items as are included on the Project Budget. At the option of Lender, Borrower shall submit each Draw Request at least ten (10) business days before the date of such Advance in order to permit Lender and Lender's Inspector to make such inspections of the Project as Lender shall from time to time consider appropriate. Each Draw Request shall be executed by an Authorized Representative. Exhibit E at 6.

According to Section 7.04 of the Agreement, however, this provision is solely for Riggs' protection, not Dupont's. Thus:

All conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and its assigns and no other person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make advances in the absence of strict compliance with any or all thereof. Exhibit E at 21.

Among the conditions of each advance, moreover, Section 6.03(i) and (j) of the Agreement permits Riggs to defer funding until it has received an inspection report confirming the progress of the project:

(i) *Approval of Construction.* Lender shall have received evidence that all development and construction completed at the time of the Draw Request has been performed in a good and workmanlike manner, that all necessary permits in connection with such development and construction have been issued and that such development and construction has been duly inspected and approved by the appropriate governmental authority.

(j) *Certificate of Lender's Inspector.* Lender shall have received the certificate of Lender's Inspection required by Section 2.02(d).

Lender's inspector is required to act "without unreasonable delay" in submitting his certificate, Agreement Section 2.02(d), but the time for such action is not otherwise specified.

Without question, the written documents provide no support for Dupont's claim that Riggs breached the Agreement because of untimely funding of the draw requests. Not only does the minimum lead time requirement of Section 2.02(c) exist for the protection of Riggs alone; Dupont misreads the "ten business days" of that provision for "ten days". Even if the clause could somehow be construed as creating a 10–day right in Dupont's favor, its claim of delay would be fanciful. Looking, for example, at the request Dupont made on May 17, 1995 for a $260,092.00 disbursement, its largest draw request by far, the date the request was funded was June 1, 1995, eleven *business* days following the date of request.

■ But Dupont contends that Riggs' loan officers orally represented that Dupont's draw requests would be considered on a semi-monthly basis with turn-around time of no more than one week. Dupont, in other words, relies upon a purported oral modification of the Agreement. The proposition cannot stand.

It is true that, while the loan documents specify that any waiver or modification must be in writing, as of one time under Maryland law parties could orally waive written requirements in a contract even when the contract specifically provided for modification only in writing. *See Nat'l Bank v. Wolfe,* 279 Md. 512, 369 A.2d 570 (1977). Since 1989, however, Maryland statutory law has provided that a commercial loan agreement will be unenforceable unless in writing and that an oral modification will not suffice. Md.Cts. & Jud.Proc.Code Ann. § 5–317 (1995 Repl. Vol.).[2] That statute expressly includes in its

---

**2.** § 5–317. Credit agreements.

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2)(i) "Credit Agreement" means a covenant, promise, undertaking, commitment, or other agreement by a financial institution to:

1. Lend money;
2. Forbear from repayment of money, goods, or things in action;
3. Forbear from collecting or exercising any right to collect a debt; or
4. Otherwise extend credit.

(ii) "Credit agreement" includes agreeing to take or to not take certain actions by a financial institution in connection with an existing or prospective credit agreement.

(3) "Financial institution" means:

(i) A bank;

(ii) A trust company;

(iii) A savings bank;

(iv) A savings and loan association; or

(v) An affiliate or subsidiary of a bank, trust company, savings bank, or savings and loan association.

(b) *Enforceability.*—A credit agreement is not enforceable by way of action or defense unless it:

(1) Is in writing;

(2) Expresses consideration;

enumeration of unenforceable contracts "agreeing to take or to not take certain actions by a financial institution in connection with an existing or prospective credit agreement." *Id.* at 5–317(a)(2)(ii). As the analysis of the bill by the Maryland Senate Judicial Proceedings Committee analysis points out:

> This Bill will protect lenders against claims that the lender made a verbal promise to loan money and then refused to do so, or that the lender verbally agreed to extend the terms of the loan.

*1989 General Assembly of Maryland, Floor Report, House Bill 704, Senate Judicial Proceedings Committee.*

> *See also Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F.Supp. 674, 676–77 (D.Md. 1993) ("Lender malpractice suits based on ... 'side agreements' are precisely the sort of mischief that the Maryland legislature intend to curtail by enactment of Md.Cts. & Jud.Proc.Code § 5–317...."). Dupont's reliance on purported oral modifications of its credit agreement with Riggs garners no sympathy in this forum.

■ In addition, there is no foundation for Dupont's claim of breach of contract in connection with Riggs' nonfunding of the August 22, 1995 draw request. Riggs did not receive the report from its inspector approving payment of the request (which pursuant to the Loan Agreement was a prerequisite to payment of any such request) until September 15, 1995. During that period, Riggs and Dupont were engaged in extensive discussions over what Riggs believed was the loan's failure to meet loan to value requirements. Riggs was in the process of requesting an additional equity infusion from Dupont and Dupont was balking. Given these facts, the

(3) Sets forth the relevant terms and conditions of the agreement; and

(4) Is signed by the person against whom its enforcement is sought.

(c) *Applicability.*—(1) This section applies only to commercial transactions.

(2) This section does not apply to:

(i) Credit agreements made primarily for personal, family, or household purposes; or

(ii) Credit extended by means of, or in connection with, a credit or charge card.

time lapse between Dupont's August 22 draw request and the September 15 receipt of the inspector's report by Riggs was reasonable as a matter of law. Dupont, in any event, is hardly in a position to complain. Well before the August request was made, Stewart Mechanic on behalf of Dupont had already decided that whatever might or might not want was unimportant. He was only interested in refinancing with another lender.

Riggs breached no obligation under its Agreement with Dupont.

## VI.

■ To the extent that a duty of good faith and fair dealing exists in Maryland, it is of very narrow scope. As the Maryland Court of Special Appeals stated in *Parker v. Columbia Bank,* 91 Md.App. 346, 604 A.2d 521 (1992), *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992):

> "Under Maryland law, a duty of good faith and fair dealing is an implied term in certain contracts ..., but this duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract. See *Automatic Laundry Service v. Demas,* 216 Md. 544, 141 A.2d 497 (1958). Thus, the duty of good faith merely obligates a lender to exercise good faith in performing its contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents."[3]

91 Md.App. at 366, 604 A.2d 521.

See also *Howard Oaks, Inc.,* 810 F.Supp. at 677. See also the *Riggs Nat'l Bank of Wash-*

3. *Automatic Laundry Service, Inc.,* cited in *Parker,* was not a commercial loan case. In *Automatic* the operator of coin-operated washing machines sued the owner of a trailer park who had agreed to install sufficient machines to permit service to the park and to share profits from the machines on the basis of gross receipts. The Maryland Court of Appeals held that the owner had an obligation not to render the contract with Automatic valueless by permitting the destructive competition created by the introduction of competing machines. Interestingly, the Court cited *Corbin on Contracts* which discusses the implied

*ington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir.1994) ("An implied duty of good faith cannot be used to override or modify explicit contractual terms.").

■ While acknowledging that none of the actions it claims Riggs failed to take are "specified in the loan documents", Dupont argues that Riggs' actions were critical to Dupont's ability to "develop the project and build and sell the townhouses and timely repay the loan." But the point is that Maryland law does not obligate a lender to take actions not required under the loan documents and no independent duty of good faith and fair dealing imposes further obligations.

Considering, for example, the claim that Riggs never gave Dupont a copy of the project appraisal, even on the assumption that the appraisal contained information important to Dupont,[4] the loan documents nowhere require that Riggs provide Dupont with the appraisal. As Riggs points out, Dupont knew it would not be receiving a copy of the appraisal prior to closing, but went forward and closed anyway. Dupont's suggestion that, if it had the appraisal, it "may have made the decision not to go forward with the loan or to seek to modify the budgets agreed to under the loan" is pure gossamer. Dupont, in any case, eventually received a copy of the initial as well as the subsequent appraisal.

As to the second basis for Dupont's bad faith claim, that Riggs failed to share its loan to value calculations, again nowhere do the loan documents obligate it to do so, however querulous Riggs' action in this regard may seem. Nothing prevented Dupont from flatly refusing to proceed unless the calculations were forthcoming. Here, too, in any case Dupont fails to demonstrate how Riggs' action caused it palpable injury.

The third basis for Dupont's attempted claim of bad faith is that a Riggs officer falsely represented that Riggs was an approved issuer of letters of credit to Prince George's County. This claim, however, sounds very much in fraud, a claim which the Court notes once comprised a separate count in the Complaint and which Dupont has withdrawn. Be that as it may, Olga Trujillo, Vice President and Manager of the Letter of Credit Department at Riggs, testified by way of affidavit that Riggs personnel had issued numerous letters of credit to Prince George's County over a ten-year period prior to the rejected letters of credit in this case and that any statement Riggs personnel may have made to Dupont that Riggs had done so would have been true when made. The fact that in early 1995 Prince George's County rejected one or two letters of credit issued by Riggs came as much as a surprise to her and everyone at Riggs as it did to Dupont. Dupont cannot refute these facts. Its claim of bad faith has as little support in fact as it does in law.

■ Last, Dupont says Riggs acted in bad faith by creating substantial uncertainty as to the funding of the loan by continually declaring Dupont "in" and "out of" compliance with loan to value requirements and additionally by refusing to continue funding without justification. Although the Court has already addressed this contention to some extent in connection with Dupont's breach of contract claim, it invites the Court to close with a general perspective.

The present case appears to be little more than a prototype "lender malpractice" suit in which a frustrated real estate developer sues its bank "blam[ing] the lender for its business failure...." *Howard Oaks, Inc.*, 810 F.Supp. 674, 676. From the beginning, Dupont's project was beset with delays over which Riggs had absolutely no control. Initially the delay came in consequence of Dupont's dispute with Prince George's County over the number of townhouse units to be

---

promise of "diligent and careful performance in good faith and of forbearance" as it pertains to commercial agreements "in which the compensation promised by one to the other is a percentage of profits or receipts, or is a royalty on goods sold, manufactured or mined." *Automatic Laundry Service, Inc.*, 216 Md. at 550, 141 A.2d 497 (citing 3 Arthur Linton Corbin, *Corbin on Con-*

*tracts* § 568 (1960)). Profit-sharing transactions, it certainly would seem, differ markedly from conventional commercial loan transactions of the type found in the present case.

4. Dupont never explains why not having a copy of the appraisal caused it actual harm.

permitted on the final plat. Thereafter fewer units were approved than had been planned for. The plat was to be recorded by September 30, 1994 and site development work was to begin by no later than November 30, 1994, but the final plat was not recorded until mid-December 1994 and site work did not get underway until the beginning of 1995. When solicited, Riggs acted promptly to supply letters of credit and when a problem arose with their acceptance by governmental authorities, it acted with similar dispatch to arrange a suitable substitute. Delays in governmental approvals, letters of credit included, are hardly unheard of in construction projects. In none of this can it be said that Riggs acted improperly.

Dupont complains that during the sixteen months its loan with Riggs was outstanding, several different loan officers were assigned to administer the loan and each one noted discrepancies between the loan documents and project events. However inconvenient that may have seemed to Dupont, there was nothing illegal nor even inappropriate about it. As the lender on a substantial project that was not only smaller than anticipated but well behind schedule, Riggs had every right to monitor its investment closely. That Dupont may ultimately have tired of Riggs' demands and decided to take its business elsewhere is one thing. But that it should have a cause of action for damages to compensate for frustration over delay in its entrepreneurial venture, is a wholly different matter. Commercial enterprises—real estate development projects perhaps more than most—involve risks. Dupont took a risk on this project and failed. On the record of this case, as a matter of law, nothing Riggs did makes it answerable for this outcome.

For these reasons, Riggs is entitled to summary judgment.