**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EASTERN SHORE MARKETS,
INCORPORATED,
<u>Plaintiff-Appellant,</u>

v.

J.D. ASSOCIATES LIMITED
PARTNERSHIP; DORCHESTER CENTER II

LIMITED PARTNERSHIP; WWM,
INCORPORATED; ERWIN L. GREENBERG
DEVELOPMENT CORPORATION II; ERWIN
L. GREENBERG & ASSOCIATES,
INCORPORATED; G.H. CAMBRIDGE
LLC,
<u>Defendants-Appellees.</u>

No. 99-1554

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-98-2994-S)

Argued: March 1, 2000

Decided: May 22, 2000

Before WILKINS, NIEMEYER, and KING, Circuit Judges.

_____

Affirmed in part and vacated in part by published opinion. Judge Nie-
meyer wrote the opinion, in which Judge Wilkins and Judge King
joined.

_____

**COUNSEL**

**ARGUED:** John E. McCann, Jr., MILES & STOCKBRIDGE, P.C., Baltimore, Maryland, for Appellant. William Alden McDaniel, Jr., MCDANIEL & MARSH, Baltimore, Maryland, for Appellees J.D. Associates, et al.; Kathleen L. Beggs, WILLIAMS & CONNOLLY, Washington, D.C., for Appellee G.H. Cambridge. **ON BRIEF:** Timothy L. Mullin, Jr., MILES & STOCKBRIDGE, P.C., Baltimore, Maryland, for Appellant. Jo Bennett Marsh, MCDANIEL & MARSH, Baltimore, Maryland, for Appellees J.D. Associates, et al.; Charles T. Kimmett, WILLIAMS & CONNOLLY, Washington, D.C., for Appellee G.H. Cambridge.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Eastern Shore Markets, Inc. sued its shopping center landlord under Maryland law for (1) breach of an express covenant not to interfere with Eastern Shore's reasonable access to its grocery store premises, (2) breach of an implied covenant to refrain from destructive competition, which allegedly was committed when the landlord introduced a competing grocery store into the shopping center, and (3) related torts. The district court dismissed Eastern Shore's complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, we affirm the district court's dismissal of the claim for breach of an express covenant, vacate its dismissal of the remaining claims of the complaint, and remand for further proceedings.

I

Eastern Shore Markets, Inc. ("Eastern Shore"), a Virginia corporation, operates a 28,569-square-foot grocery store in the Dorchester Square Shopping Center in Cambridge, Maryland, on premises leased from J.D. Associates Limited Partnership, formerly known as Dorchester Center Limited Partnership ("J.D. Associates"). The Dorchester Square Shopping Center, a strip mall, was constructed in 1987. The "anchor" at one end of the mall was "JamesWay" department

2

store; the anchor at the other end was designated for a "future department store." Eastern Shore's grocery store and a smaller drug store were located between the anchors, along with other smaller retail stores. Under the lease between Eastern Shore and J.D. Associates, which provides for an initial term of 20 years, Eastern Shore agreed to pay a base rent plus a "percentage rent" of 1.25% of the store's annual gross sales in excess of $10 million.

Although the lease between Eastern Shore and J.D. Associates does not explicitly give Eastern Shore an exclusive right to be the only grocery store in the shopping center, the lease does incorporate a site plan that was "approved by the parties." This site plan outlines and labels the premises of each facility in the center, designating the larger spaces for the JamesWay department store (61,420 square feet); a "future department store" (30,000 square feet); Eastern Shore's grocery store (28,569 square feet); and a similarly sized area designated "future retail." The lease also provides that Eastern Shore operate only a "[s]upermarket primarily for sale of food" in the mall and that, if it were to operate another grocery store within a three-mile radius of the mall, it would have to include that store's gross sales "in the computation of the percentage rent" payable to J.D. Associates under the lease.

The lease gives J.D. Associates wide discretion in the management of the common areas, including parking spaces, which are placed under its "exclusive control and management." The lease provides expressly that J.D. Associates is authorized to

> change the area, level, location and arrangement of the parking areas . . . reduce some by erecting buildings or improvements . . . to close temporarily all or any portion of the parking areas . . . and perform such other acts in and to said areas . . . as, in the use of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by Tenants .. . and [their] customers.

The lease gives Eastern Shore a revocable license to use the common areas, but the license provides that the common areas may be "dimin-

3

ished" without consequence, "provided reasonable access remains for Tenant, its employees and customers."

The disputes giving rise to Eastern Shore's complaint in this action arose from (1) the construction of a Wal-Mart store in 1995-96 after JamesWay went out of business and J.D. Associates conveyed the "JamesWay" property to Wal-Mart and (2) the competition created by J.D. Associates' sale of the "future department store" site to a developer who constructed a 52,000 square-foot Metro Food Store, which opened in September 1996. As a consequence of these actions, on August 31, 1998, Eastern Shore commenced this action based on diversity jurisdiction against J.D. Associates, its affiliates,[1] and G.H. Cambridge, LLC, the entity to which J.D. Associates and its affiliates transferred the "future department store" property for the construction of the Metro Food Store.

Eastern Shore's complaint alleges that during the construction of the Wal-Mart store on the "JamesWay" property, the east entrance of the shopping center was blocked, requiring Eastern Shore's customers who approached the shopping center on U.S. Route 50 from the east to proceed past the shopping center almost two miles, turn around, and drive back to an entrance accessible only from the eastbound side of U.S. Route 50. Similarly, Eastern Shore alleges that the construction of the Metro Food Store on the "future department store" site resulted in construction trailers and other vehicles being parked directly in front of Eastern Shore's store, obstructing views of the store and denying its customers reasonable access to the store. The complaint also alleges that the parking lot in front of Eastern Shore's store was relined and reconfigured so that the parking spaces "faced" Metro Food Store. In addition, as part of the parking reconfiguration, a concrete island was constructed across the front of Eastern Shore's

_____

[1] J.D. Associates' affiliates include Dorchester Center II Limited Partnership; WWM, Inc.; Erwin L. Greenberg Development Corporation II; and Erwin L. Greenberg & Associates, Inc. The complaint alleges that Erwin L. Greenberg & Associates, Inc. is affiliated with and/or controls WWM, Inc. and Erwin L. Greenberg Development Corporation II. WWM, Inc. is the general partner of J.D. Associates, Inc., and Erwin L. Greenberg Development Corporation II is the general partner of Dorchester Center II Limited Partnership.

4

store. The complaint alleges that these interferences with the common areas breached the explicit terms of the lease by denying Eastern Shore's customers "reasonable access" to the store and by benefiting Metro Food Store at Eastern Shore's expense.

Eastern Shore's complaint also alleges that, by allowing the construction of a Metro Food Store in competition with Eastern Shore's grocery store, J.D. Associates violated "an implied duty of good faith and fair dealing." It alleges that the defendants constructed a modern, warehouse-style Metro Food Store in excess of 52,000 square feet that "dwarfed" Eastern Shore's much smaller store, introducing destructive competition.

The complaint alleges that the effect of the interference with parking and reasonable access and the competitive activity from Metro Food Store was "devastating," causing the monthly sales at Eastern Shore's store to "plummet[ ] approximately 30%, thereby threatening the Store's economic viability." Eastern Shore demands $8 million in damages.

In addition to the breach-of-lease claims, the complaint alleges that the affiliates of J.D. Associates and G.H. Cambridge conspired to induce, and indeed induced, J.D. Associates to breach its express and implied obligations under Eastern Shore's lease and that those parties are liable for tortious interference with contract, tortious interference with business relations, and civil conspiracy.

The defendants filed two separate motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, relying on submitted affidavits, for summary judgment. The district court refused to rely on the submitted affidavits and dismissed the complaint under Rule 12(b)(6). The court concluded that "Maryland law does not imply a covenant in retail development leases that the developer will not lease space to a competitor of the lessee, even where the rent is partially dependent upon gross sales of the lessee." The court also concluded that under the lease, Eastern Shore could not complain that the reconfiguration of the parking lot during the construction of the Metro Food Store favored Metro Food. It noted that "[t]here is no dispute that customers still could get to and park near [Eastern Shore's grocery store] in a reasonable fashion." Finally, the

5

court dismissed Eastern Shore's complaint arising out of the Wal-Mart construction as time-barred, either by operation of the relevant three-year statute of limitations or by laches.

This appeal followed.

II

In reviewing a district court's order dismissing a complaint under Federal Rule of Civil Procedure 12(b)(6) for plaintiff's "failure to state a claim upon which relief can be granted," we determine de novo whether the complaint, under the facts alleged and under any facts that could be proved in support of the complaint, is legally sufficient. See Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991); see also Fed. R. Civ. P. 8(a)(2) (establishing as a pleading requirement that a claim contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). Because only the legal sufficiency of the complaint, and not the facts in support of it, are tested under a Rule 12(b)(6) motion, we assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957). While we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts. See Schatz, 943 F.2d at 489. Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments. See generally 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990 & 1998 Supp.).

With these standards in hand, we now turn to the complaint at issue in this case.

III

We first address Eastern Shore's claim that J.D. Associates breached express covenants of the lease. Eastern Shore's complaint alleges that J.D. Associates promised in the lease to manage the parking lot so as not to deny Eastern Shore's customers reasonable access to Eastern Shore's store and in a manner beneficial to the store and

its customers. Eastern Shore alleges that J.D. Associates breached these express promises in three ways: (1) by allowing the east entrance of the shopping center's parking lot to be blocked during the Wal-Mart construction; (2) by allowing construction vehicles to park in front of its store during the Metro Food Store construction; and (3) by relining and reconfiguring the parking lot to benefit Metro Food Store at Eastern Shore's expense.

The lease, a copy of which was attached to the complaint, grants J.D. Associates discretion to control and manage the parking lot and the entrances and exits thereto, providing that J.D. Associates "shall have the right from time to time" to "change the area, level, location, and arrangement of parking areas" and "to close temporarily all or any portion of the parking areas or facilities." Moreover, J.D. Associates' conferred discretion to close a parking-lot entrance temporarily and to rearrange the parking lot is not limited by any express provision in the lease. In addition, the lease permits J.D. Associates to "reduce [the parking areas and facilities] by erecting buildings or improvements of any kind."

We conclude that these provisions of the lease between Eastern Shore and J.D. Associates give J.D. Associates broad discretion over the management and control of the parking lot and that J.D. Associates' actions in temporarily blocking access to and customers' view of Eastern Shore's store fall within this conferred discretion. We also conclude that the reconfiguration of the parking spaces falls within J.D. Associates' right to "change the area, level, location, and arrangement of parking areas."

Eastern Shore argues that two provisions in the lease limit J.D. Associates' discretion over the control and management of the parking lot. First, it points to language in the lease that

> Landlord shall have the right to . . . perform such other acts in and to said areas and improvements as, in the use of good business judgment, Landlord shall determine to be advisable with a view to the improvement of the convenience and use thereof by Tenants, their officers, agents, employees and customers.

7

This provision of the lease, however, does not advance Eastern Shore's argument, because "such other acts" do not include the specified acts of "chang[ing] the area, level, location, and arrangement of parking areas," of "clos[ing] temporarily all or any portion of the parking areas or facilities," or of reducing the parking area by "erecting buildings or improvements." The right to rearrange the parking lot, temporarily close an entrance thereto, and reduce the size of the lot in connection with the construction of new buildings is expressly and unconditionally reserved by J.D. Associates in the lease and therefore is not covered by the "such other acts" language.

Eastern Shore also seeks support from language in the lease providing that

> if the amount of [common areas] be diminished, Landlord shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor shall diminution of such areas be deemed constructive or actual eviction, <u>provided reasonable access remains for Tenant, its employees and customers</u>.

(Emphasis added). This provision similarly provides no assistance to Eastern Shore, because the language is qualified. The reasonable-access provision comes into play only "if the amount of [common areas] be diminished." Eastern Shore does not assert that it was damaged by any diminution in the size of the parking area. Rather, it complains that its customers were denied reasonable access to the store as the result of the temporary blocking of a parking lot entrance, the presence of construction vehicles, and the reconfiguration of the parking lot.

Because the lease expressly gives J.D. Associates the right to take the actions alleged by Eastern Shore in the complaint, the district court properly dismissed Eastern Shore's claim related to these express provisions.[2] Cf . Schuster v. White Coffee Pot Family Inns,

_____

[2] Eastern Shore also contends that the district court erred in dismissing its claim for the parking-lot obstruction associated with the Wal-Mart construction based on the applicable statute of limitations and laches. Because we have ruled that the complaint in this regard fails to state a claim upon which relief can be granted, we not need reach these limitations and laches questions.

8

<u>Inc.</u>, 406 A.2d 452, 453-54 (Md. Ct. Spec. App. 1979) (holding that landlord, who promised restaurant nonexclusive use of "all" of a parking area "during the term of the lease," could not eliminate part of restaurant's parking area upon the justification that lease reserved landlord's right "from time to time to change the area, location and arrangement of parking areas").

IV

Eastern Shore next contends that the district court erred in dismissing its claim for breach of the lease's implied covenant of good faith and fair dealing. In its complaint, it alleges that (1) its rent in part is calculated as a percentage of its gross sales; (2) the lease prohibits Eastern Shore from using its premises for any purpose other than a grocery store; (3) J.D. Associates allowed the construction of a "competing Metro Food Store"; and (4) as a result, Eastern Shore suffered "severe injury to its economic and financial interests." It concludes with an allegation that through this conduct, J.D. Associates "directly and materially breached its implied duty of good faith and fair dealing to Eastern Shore."

In its brief on appeal, Eastern Shore alternatively refers to an implied covenant of exclusivity and an implied covenant not to engage in destructive competition, which it claims are aspects of the broader covenant of good faith and fair dealing. It asserts that Maryland law explicitly recognizes a covenant against destructive competition as part of the covenant of good faith and fair dealing and that the covenant against destructive competition is tantamount to an expectation of exclusivity, <u>i.e.</u>, the right to be the only grocery store in the shopping center.

The district court treated Eastern Shore's claim as one alleging a breach of an implied covenant of exclusivity and dismissed the complaint on that basis. The court stated:

> In the absence of any direct Maryland authority implying an exclusivity clause in leases akin to the one in this case, the Court holds that the governing (under <u>Erie</u>[<u>R. R. Co. v. Tompkins</u>, 304 U.S. 64 (1938)]) Maryland law bars all claims grounded on the existence of an implied exclusivity

9

clause, which includes the idea that the same result (implied exclusivity) is compelled by the general duty of good faith and fair dealing.

In distinguishing Automatic Laundry Service, Inc. v. Demas, 141 A.2d 497, 501 (Md. 1958), which held that an implied covenant exists under Maryland law not to render a contract valueless by permitting destructive competition, the district court said:

> The Automatic case involved -- quite literally -- a nickel-and-dime concession for coin-operated washing machines in a trailer park -- obviously with a location-driven, limited clientele -- a matter far different from the complex real estate development lease in this case, which contained an integration clause and spelled out many, many details of the duties and rights of the parties.

A

Maryland law recognizes an implied covenant of good faith and fair dealing in all negotiated contracts. See , e.g., Julian v. Christopher, 575 A.2d 735, 739 (Md. 1990); Food Fair Stores, Inc. v. Blumberg, 200 A.2d 166, 173-74 (Md. 1964) ("[I]n every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others"); cf. Suburban Hosp., Inc. v. Dwiggins, 596 A.2d 1069, 1076-77 (Md. 1991) ("Although we have generally implied a covenant of fair dealing in negotiated contracts, there is no implied covenant of fair dealing with regard to termination by either side in an employment-at-will") (footnote omitted). But the covenant of good faith and fair dealing "does not obligate a [party] to take affirmative actions that the[party] is clearly not required to take under [the contract]." Parker v. Columbia Bank, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992) (addressing duty of good faith and fair dealing in contracts between lender and borrower). Rather, the duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." Id.

Under certain circumstances, the covenant of good faith and fair dealing as recognized in Maryland includes an implied duty to refrain

10

from destructive competition. See Food Fair, 200 A.2d at 173-74; Automatic Laundry, 141 A.2d at 500-01; cf . Dupont Heights Ltd. Partnership v. Riggs Nat'l Bank, 949 F. Supp. 383, 389 & n.3 (D. Md. 1996) (noting that Automatic Laundry, in recognizing an implied covenant prohibiting destructive competition, addressed contracts involving profit sharing and suggesting that its principles do not apply to other types of contracts). The duty to refrain from destructive competition obligates each party "not to render valueless his contract with [the other party] by permitting . . . destructive competition." Automatic Laundry, 141 A.2d at 501.

In Automatic Laundry, a laundry-service company leased several coin-operated washing machines to a trailer park. Under the lease agreement, the laundry service was to install and maintain the machines and to retain 75% of the receipts from the machines, remitting 25% of the receipts to the trailer park. When the son of the trailer park's owner subsequently installed additional machines at the trailer park and operated them in competition with the leased machines, the laundry service sued, seeking an injunction and damages. The Maryland Court of Appeals found that a duty of loyalty to refrain from destructive competition was implied in the lease agreement and held that the son of the owner of the trailer park could be "properly held accountable . . . for any profits which he may have derived from the improper competition." 141 A.2d at 501. The court noted that two factors supported the implication of a duty to refrain from destructive competition. First, the parties to the lease agreed to share profits on the basis of gross receipts; second, the laundry service was obligated under the agreement to install enough machines to render adequate service to the trailer park, and did so. The court deduced that the precipitous plunge in the leased machines' earnings upon the installation of the new machines provided evidence that the new machines made performance of the lease agreement impossible. The court quoted 3 Corbin on Contracts § 568, at 200-01 (1951):

> In any commercial agreement in which the compensation promised by one to the other is a percentage of profits or receipts, or is a royalty on goods sold, manufactured or mined, there will nearly always be found an implied promise of diligent and careful performance in good faith and a for-

11

bearance to make performance impossible by going out of business or otherwise.

141 A.2d at 500.

In different circumstances, the Maryland Court of Appeals in Food Fair similarly recognized the covenant of good faith and fair dealing, although it found no breach of the duty when a shopping-center lessee opened additional stores outside of the center that could drain sales from the lessee store. See 200 A.2d at 173-74. In Food Fair, the lessee grocery store agreed to pay a base rent plus a rent calculated as a percentage of gross sales. After entering into the lease, the grocery store opened additional stores in the area, which the lessor claimed was a breach of the lease's implied covenant of good faith and fair dealing. In determining whether the covenant had been breached, the Maryland court rejected a categorical rule and turned to "the intention with which the parties entered into the contract of lease, as expressed in the contract, construed in the light of the circumstances in which the contract was made." 200 A.2d at 174. Declining to impose a duty that would interfere with grocery store's good faith conduct of its business, the court relied on several relevant factors: (1) the lessor did not allege a willful intent on the part of the grocery store to undermine the sales of the store; (2) the grocery store did not abandon its business in the shopping center; (3) the grocery store was engaged in a highly competitive business; (4) the lease was quite long and the product of prolonged negotiations; and (5) the lease for the grocery store included a provision for an increased base rent if the store ceased operation.

In short, while the implied duty of good faith and fair dealing as recognized in Maryland requires that one party to a contract not frustrate the other party's performance, it is not understood to interpose new obligations about which the contract is silent, even if inclusion of the obligation is thought to be logical and wise. An implied duty is simply a recognition of conditions inherent in expressed promises. Thus, if a party promises to pay for its purchase of a business from the profits of a business, inherent in this promise is the agreement that the promisor will exercise reasonable diligence in continuing to conduct the business. See Automatic Laundry, 141 A.2d at 501. In the same vein, a promisor who undertakes to distribute products for the

12

promisee impliedly agrees to exercise best efforts, see Foster-Porter Enterprises v. De Mare, 81 A.2d 325, 332-33 (Md. 1951), and a promisor who undertakes to exercise judgment on behalf of a promisee impliedly agrees to exercise good judgment, see Julian, 575 A.2d at 738-39. Stated otherwise, under the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them. See Automatic Laundry, 141 A.2d at 500-01; Restatement (Second) of Contracts § 205 (1990); 13 Williston on Contracts , § 38:15, at 437 (2000); cf. Md. Code Ann., Com. Law (U.C.C.) § 1-203.

B

Eastern Shore claims that three attributes of its lease give rise to either an implied covenant of exclusivity or an implied duty not to engage in competition deliberately destructive of the mutual benefit contemplated by the contract. First, Eastern Shore points to the lease's provision for the calculation of rent based in part on the gross sales made by Eastern Shore. Second, Eastern Shore notes that, under the lease, it agreed to operate only a grocery store on the leased premises. Third, Eastern Shore highlights the shopping-center site plan, which was made part of the lease, and its inclusion of Eastern Shore's store as the only grocery store in the tenant mix. Eastern Shore asserts that these attributes of the lease illustrate the parties' understanding that Eastern Shore's grocery store would be the only grocery store in the shopping center, or, alternatively, that J.D. Associates would not deliberately thwart Eastern Shore's ability to attract customers and be profitable.

To the extent that Eastern Shore alleges a breach of an implied covenant of exclusivity, we agree with the district court that such an allegation fails to state a claim upon which relief can be granted. A covenant of exclusivity is a valuable benefit for which parties to agreements traditionally bargain and on which they generally either reach or deliberately decide not to reach agreement. Therefore, when parties do not include such a clause in their agreement, we are not free to insert one by implication. Even when the parties include an express restrictive covenant in a deed or lease, under Maryland law the covenant is generally "strictly construed so as to favor the unrestricted use

13

of property." Maryland Trust Co. v. Tulip Realty Co., 153 A.2d 275, 282 (Md. 1959). We have found no published opinion in which a court has held that, in Maryland, a restrictive covenant of exclusivity arises out of the implied covenant of good faith and fair dealing.

But this conclusion does not end the analysis in this case. Eastern Shore has not limited its complaint to breach of an implied covenant of exclusivity, although it has confusingly styled its arguments to include such a claim. In its arguments, Eastern Shore has treated as interchangeable its claim for breach of a covenant of exclusivity and its claim for breach of an implied covenant against destructive competition, and it has used both labels to describe aspects of the implied covenant of good faith and fair dealing. Significantly, however, Eastern Shore's complaint, on which our decision must be based, explicitly couches its claim in terms of a breach of the implied covenant of good faith and fair dealing, which Maryland clearly recognizes. Giving the claim its asserted scope, we cannot say that it fails under any probable set of facts to state a claim upon which relief can be granted. Food Fair and Automatic Laundry together establish that, under Maryland law, the intentions of parties as expressed in the lease providing for rent calculated in part as a percentage of sales, combined with the circumstances surrounding the lease's formation, may give rise to an implied covenant to refrain from competition that is destructive to the mutual benefit of the contracting parties. See Food Fair, 200 A.2d at 173-74; Automatic Laundry, 141 A.2d at 500-01.

Eastern Shore alleges in its complaint that J.D. Associates willfully undermined its profitability and threatened its viability. It asserts that certain features of its lease agreement contemplate a particular tenant mix and an important role for its store as the only grocery store within the shopping center. Viewing the complaint in the light most favorable to Eastern Shore, as we are required to do on review of a 12(b)(6) motion, we cannot conclude that Maryland courts would categorically refuse to recognize an implied covenant to refrain from destructive competition in the lease between Eastern Shore and J.D. Associates. We recognize that further proceedings below may reveal facts and defenses counseling against the implication of such a covenant. But without the benefit at this stage of the right to evaluate facts, we conclude that this claim should not have been dismissed under the rigid standards that control the disposition of 12(b)(6) motions.

14

Accordingly, we vacate the judgment as to this claim and remand for further proceedings.

V

Having dismissed Eastern Shore's claims alleging breaches of express and implied covenants of the lease, the district court also dismissed the claims against J.D. Associates' affiliated entities and G.H. Cambridge for tortious interference with contract, tortious interference with business relations, and civil conspiracy. Because we have recognized a potential claim for breach of the implied covenant of good faith and fair dealing, we must conclude that Eastern Shore's allegations of these torts are legally sufficient.

G.H. Cambridge asserted in its motion to dismiss that Eastern Shore's claims are barred by the doctrine of estoppel and that its actions were protected by a competitive privilege recognized under Maryland law. A Rule 12(b)(6) motion, however, does not generally invite an analysis of potential defenses to the claims asserted in the complaint. See Brooks v. City of Winston-Salem , 85 F.3d 178, 181 (4th Cir. 1996). A court may consider defenses on a 12(b)(6) motion only "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." Id.; see also 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 348-49 (2d ed. 1990). The defense of estoppel derives from specific factual inquiry and its existence is not clearly indicated in Eastern Shore's complaint. G.H. Cambridge's defense of competitive privilege is similarly unsuited for review at this stage of the proceedings, because the existence of that defense is also not readily apparent from the face of the complaint. Moreover, such a defense would appear to be available only where a party induces the breach of an at-will contract. See Macklin v. Robert Logan Assocs., 639 A.2d 112, 120 (Md. 1994) ("[W]hen the existing contract is not terminable at-will, inducing its breach, even for competitive purposes, is itself improper and, consequently, not `just cause' for damaging another in his or her business").

Accordingly, we must also vacate the judgment insofar as it dismisses these tort claims.

15

In sum, we affirm the district court's dismissal of Count I of the complaint, vacate its order dismissing Counts II - V, and remand the case for further proceedings.

<u>AFFIRMED IN PART, VACATED IN PART,</u>
<u>AND REMANDED FOR FURTHER PROCEEDINGS</u>

16